Geilfuss vs. Corrigan and another.

GEILFUSS, Assignee, Respondent, vs. CORRIGAN and another, imp., Appellants.

*December 16, 1896 — April 30, 1897.*

| 95 | 651 |
| s37 LRA | 166 |
| 39 LRA 725n |
| 43 LRA 658n |
| 50 LRA 235n |

*Sale of chattels: "Warehouse receipts:" Constructive possession: Fraudulent conveyances: Pledges: Judgment note: Fraud.*

1. In order to render storage warrants " warehouse receipts " so that title to and constructive possession of the property covered thereby would pass by their transfer and indorsement, they must have been issued by a warehouseman or one openly engaged in the business of storing property for others for a compensation; and the mere fact that a corporation engaged in smelting ore issued such war-

Geilfuss vs. Corrigan and another.

rants on iron in its yard did not constitute it a warehousing corporation.

2. Good faith on the part of a pledgee does not render the pledge valid, in the absence of delivery of the possession, either actual or constructive.

3. A furnace corporation engaged in smelting iron ore gave a mining corporation receipts in the form of "storage warrants" on iron stored in its yard in order to raise money without injuring its credit. Both corporations were under the absolute ownership and control of the same person. There was no consideration for the transfer, and no other delivery of the property than the turning over of the warrants, and it was understood that they should be returned whenever the furnace company needed them on account of sales of iron. No specific iron was ever set apart as covered by the warrants, but other iron was piled in the yard as it was manufactured and shipments made therefrom indiscriminately. *Held*, that the mining company acquired no title to the iron as against creditors of the furnace company.

4. A bank which received such storage warrants in good faith from the mining company as collateral, but which never had any other possession of the iron than that given by the transfer of the warrants and never notified the furnace company of its claim thereto, but permitted the latter to dispose of the iron on hand and substitute other iron in its place,—acquired no lien on the iron as pledgee as against third persons, even conceding that the title thereto passed to the mining company.

5. The fact that a judgment note was obtained for the purpose of entering judgment and levying execution on the property of the debtor does not render the note fraudulent.

APPEAL from a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Reversed.*

This is an action to recover the value of 10,800 tons of pig iron levied on by the sheriff of Mercer county, Pennsylvania, on the 19th day of July, 1893, upon an execution issued out of the court of common pleas of Mercer county, Pennsylvania, upon a judgment in favor of Price McKinney, receiver of Corrigan, Ives & Co., for $178,908, against the Douglas Furnace Company, a corporation under the laws of the state of Illinois. The title of the iron is the question in

controversy in this case. The plaintiff, as assignee of the bank, claims a right in this iron, as pledgee of the Buffalo Mining Company, a Wisconsin corporation, and of Ferdinand Schlesinger, to secure certain loans made by the bank to the Buffalo Mining Company and to Schlesinger. The defendants, who are members of the firm of Corrigan, Ives & Co., justified the seizure and subsequent sale of the iron under the said execution against the Douglas Furnace Company, on the ground that the attempted transfer or pledge of the same was fraudulent and void as against creditors of the Douglas Furnace Company.

The action was tried by the court, without jury, and the facts developed upon the trial were substantially as follows:

In the year 1893 the Buffalo Mining Company was a mining corporation, engaged in mining iron ore in the northern peninsula of Michigan, and was a lessee of the Buffalo Mine and a number of others. At the same time, the Douglas Furnace Company was an Illinois corporation, engaged in smelting iron ore and manufacturing pig iron in Mercer county, Pennsylvania, where it owned three furnaces near Sharpsville and Sharon, in said county, which furnaces were known as the Sharpsville, Douglas, and Sharon Furnaces, respectively. For some time prior to the year 1893, and up to the 7th day of July in that year, the defendants *Corrigan* and *Burke*, with one Franklin T. Ives (who was not served on, and did not appear in this action), were copartners, doing business at Cleveland, Ohio, under the firm name of Corrigan, Ives & Co., and were engaged in the business of selling iron ore and making advances thereon for a commission as factors. Both of the corporations were under the absolute control of Ferdinand Schlesinger, who owned all, or nearly all, of the stock in each corporation. Schlesinger's business was conducted at the city of Milwaukee. One Max Hirschfeld was the president of the Douglas Furnace Company, and there seems to have been nominally a

board of directors of that corporation. Hirschfeld's place of business was at Sharpsville, Pennsylvania, and he was the active manager of the furnace company's business, acting entirely under the direction of Mr. Schlesinger. The office of the Buffalo Mining Company seems to have been at Milwaukee, and this corporation also, while it nominally had officers, was absolutely under the control of Mr. Schlesinger, and its officers did his bidding.

In the early part of the year 1893, both of the corporations were doing a large business in their respective fields, and so was the firm of Corrigan, Ives & Co. In February, 1893, a contract was made by the Buffalo Mining Company with Corrigan, Ives & Co., whereby the latter firm made advances to the Buffalo Mining Company, and chartered vessels for the transportation of its ore, and handled the ore output of the Buffalo Mining Company, as factors upon commission. They were also to collect the proceeds of sales of ore which, when collected, were to be applied in payment of advances made to the mining company under this contract. Between February 1, and about the 1st of July, 1893, Corrigan, Ives & Co. had received and handled from the Buffalo Mining Company ore amounting in value to between $200,000 and $300,000, and had made advances thereon to the Buffalo Mining Company amounting to about $200,000. It appears that Corrigan, Ives & Co. did not know, prior to the month of June, 1893, of the relationship of Schlesinger to the Douglas Furnace Company. Between January 1 and July 18, 1893, Corrigan, Ives & Co. sold and delivered to said Douglas Furnace Company large quantities of iron ore, nearly all of which came from the Buffalo Mining Company, upon which there was a balance owing on the 18th of July, 1893, of $178,908.85, part of which had matured, and part had not then matured. During the time from January to July, 1893, the Douglas Furnace Company was actively engaged in smelting iron ore, and making pig iron, and selling

the same from its furnaces and yards in Pennsylvania, such pig iron being nearly all made from the ore of the Buffalo Mining Company sold to the furnace company by Corrigan, Ives & Co. During the aforesaid time some 70,000 tons of pig iron were manufactured by the furnace company, and, on the 18th of July aforesaid, there were left on hand in its yards 22,000 tons of such pig iron. On this 18th day of July, 1893, therefore, Corrigan, Ives & Co. had made advances upon ore to the Buffalo Mining Company of about $200,000; the Douglas Furnace Company was indebted to Corrigan, Ives & Co. in the sum of more than $178,000, as the purchase price of ore sold to it; and at the same time the Douglas Furnace Company had in its yards 22,000 tons of pig iron manufactured from the ore which had been sold to it by Corrigan, Ives & Co.

In January, 1893, Mr. Schlesinger became desirous of borrowing money for his various enterprises of the banks in the city of Milwaukee, by means of so-called storage warrants upon the pig iron which was accumulating in the furnace yards at Sharpsville. On the 21st of January, he addressed a letter to Mr. Hirschfeld, at Sharpsville, as follows: "I see that quite an amount of pig iron is accumulating. What do you think of taking out some storage warrants against such iron, or could you, without taking out storage warrants, borrow some money on the pig iron in the yards? Please let me know your suggestion about it, and it would be very desirable if you could have the pig iron turned into money right along." Mr. Hirschfeld replied by letter on the 25th of January, in which he said that the only way of borrowing money on pig iron would be by taking out storage warrants through the medium of a storage company, but that such a course would be expensive, and would require a sublease of the iron yards, and that as he did not need any large amount of money before the middle of February, he would have time to look the matter up and make a report.

About the 1st of February,. 1893, Mr. Hirschfeld was in
Milwaukee, and had a personal consultation with Mr. Schles-
inger on the subject of issuing storage warrants, and Mr.
Hirschfeld then explained to Mr. Schlesinger that it was
very expensive to have storage warrants issued by a storage
company; that they charge so much a month for each ton
of pig iron covered by the warrants. Mr. Schlesinger then
said: "I do not think we need a storage company. I think
we can issue our own warrants," — and he told Hirschfeld
he would get some warrants printed, and send them down
to Sharpsville, and he (Hirschfeld) could fill them out as he
(Schlesinger) would write for them. Mr. Schlesinger then
had fifteen formal storage warrants written out in the office
by a typewriter, and Mr. Hirschfeld signed them, as presi-
dent of the Douglas Furnace Company. Just how many
tons of pig iron were represented in these fifteen warrants
does not definitely appear. The following was the form of
the warrants:

### Warrant.

Number ———.    Amount received, ——— tons. Less loss in weight
from handling by scale, rust, or sand, if any, not
to exceed ——— tons.

Douglas Furnace Company, Sharpsville, Mercer Co., Pa., hereby ac-
knowledge to have received ——— tons of pig iron, and will deliver the
same, less loss in weight from handling by scale, rust, or sand, if any,
not to exceed ——— tons, to the order of Buffalo Mining Company, at
its yards at Sharpsville, Pa., upon payment of storage and charges, and
the surrender of this warrant properly indorsed.

### Memorandum.

Charges from 189-, viz.: Labor included, ——— cts. per ton. Storage,
per month, ——— cts. per ton. If reweighed when delivered, ———
cts. per ton. Storage charges named above payable every six months
from date. If not paid, interest will be charged. Reported brand
———, said to be ———, record book page ———. Sharpsville, Mercer
county, Pa., ———, 1893.

By DOUGLAS FURNACE COMPANY.
MAX HIRSCHFELD, President.
F. F. OSBORNE, Secretary.

Mr. Hirschfeld then returned to Sharpsville, and, on the 8th of February, Mr. Schlesinger, through his secretary, Mr. Krielsheimer, wrote a letter to Mr. Hirschfeld in which he said: " You may charge the issued storage warrants to the Buffalo Mining Company at the market price; but it is best that you charge them at round figures per ton,— say $12.50 or $13.00,— *so that you may credit the warrants at the same figure when we return them.*" On the 11th day of February, Mr. Schlesinger wrote again to Mr. Hirschfeld, as follows: "We have this day forwarded to you by express a book of storage warrants. Of the warrants you left with us here, we have used 1 to 15, inclusive, and herewith return to you Nos. 16 and 17, for which you will discharge our account. On receipt of the book sent you to-day, you will please issue for the inclosed two new warrants, and also issue and send us as many more 100 and 200 ton warrants as you have pig iron against which you have not issued any warrants." Mr. Hirschfeld replied to this letter, inclosing twenty-four storage warrants, and stating: "You have now received storage warrants amounting in all to 5,600 tons,— carried out, $74,200,— for which amount we charge you account. *If warrants are returned, they will be credited to you at the above prices.*" On the 4th of March, Mr. Krielsheimer wrote a letter saying that Mr. Schlesinger wished to receive warrants for 2,000 more tons of iron by return mail. On the 7th of March, Mr. Hirschfeld replied to this letter, and inclosed warrants for 1,600 tons of pig iron, and said: "I have now sent you warrants for all the iron in the yard, within a few hundred tons, and, *of course, if we should receive large orders for immediate shipment, some of the warrants will have to be returned.*" On April 6, Krielsheimer telegraphed to Hirschfeld as follows: "Send certificates, if possible, to-day, on everything not yet issued in amount of about 500, made out as before." On April 7, Hirschfeld sent in reply to this request certificates for 2,400 tons. On July 3, Hirschfeld

sent certificates for 3,000 tons, and said: "We understand that you will return warrants for 1,000 No. 1 Douglas and 1,000 tons No. 2 Douglas, *which we absolutely need, as the iron has been shipped.* We have sent you now warrants for all the iron in the yard except 2,000 tons, from which we make daily shipments."

From time to time between the 4th of March and the 3d of July, 1893, the Buffalo Mining Company, acting through Ferdinand Schlesinger, its president, or William Schlesinger, its treasurer, or Mr. Krielsheimer, borrowed of the Commercial Bank of Milwaukee various sums, the total amount being $97,051.75, and indorsed and delivered to said bank forty-nine of the storage warrants before referred to, which covered or represented an aggregate of 10,800 tons of pig iron. These warrants were first deposited or pledged as security for the indebtedness of the Buffalo Mining Company alone, but on the 12th day of July, 1893, a further agreement was made between the bank, the mining company, and Schlesinger by which the warrants were also hypothecated for any indebtedness owing by Schlesinger to the bank, which amounted to more than $50,000. Mr. Hirchfeld testified, and the fact was not denied, that it was the understanding that the warrants would be returned to the Douglas Furnace Company, and credited back. The entire testimony shows without dispute that it was not supposed or expected that the issuance of any of these warrants constituted a sale of the iron to the Buffalo Mining Company, but that the intention was that the apparent title should be vested in the Buffalo Mining Company for the purpose simply of allowing Mr. Schlesinger and the mining company to borrow money thereon. Upon the books of each corporation a storage-warrant account was opened, separate from the other accounts between the two corporations.

At the time of the levy upon the iron, in July, 1893, there were outstanding, in all, storage warrants representing on

Geilfuss vs. Corrigan and another.

their face 18,874 tons of pig iron, including the 10,800 tons hypothecated to the Commercial Bank. It appears that there were open accounts kept between the Buffalo Mining Company and the Douglas Furnace Company; that on the 1st of January the mining company was indebted to the Douglas Furnace Company on its account in the sum of more than $5,000; that there were frequent remittances of cash and bills receivable from one company to the other; and that between the 1st of February and the latter part of July, 1893, the furnace company incurred an indebtedness to the mining company for cash and bills receivable remitted to the amount of $338,529.04, and during the same time the mining company became indebted to the furnace company, including the amount charged upon the warrant account, in the sum of $560,832.89, leaving a nominal balance due the furnace company of $222,303.85. There was no change of possession of any of the iron at any time. It remained piled up in the yards of the furnace company in Pennsylvania, without any mark thereon to designate what was covered by the warrants and what was not. The furnaces turned out about 400 tons per day, and this was immediately piled up in the yards, and the business was conducted in all respects as though there were no liens or incumbrances upon the iron. The testimony of Mr. Hirschfeld is that he always had enough iron in the yards to cover all of the warrants outstanding. In June, 1893, it appears that the firm of Corrigan, Ives & Co. began to desire some security for their claims against the furnace company, and they wrote to Mr. Schlesinger, suggesting that regular storage warrants be issued to them upon the pig iron at the furnaces.

About the middle of June, Mr. Hirschfeld, at the direction of Mr. Schlesinger, went to the office of Corrigan, Ives & Co., and had an interview with them on this subject. Hirschfeld testifies that he told them that he did not consider it advisable to take out storage warrants, as they

would hurt the credit of the furnace company, and that, as the company had always met all its obligations promptly, he saw no necessity of it. Mr. Hirschfeld says he did not tell Corrigan, Ives & Co. at the time that storage warrants had already been issued upon any of the iron at the furnaces. The testimony of the firm, on the other hand, is that Mr. Hirschfeld said at that time that no warrants had been issued upon any of the iron. As a result of this interview, the lease of the ore yards was transferred to Corrigan, Ives & Co., to partially secure them for their claims.

In the month of June, 1893, Corrigan, Ives & Co. became alarmed concerning the financial situation of Mr. Schlesinger and his mining companies. It appears that Corrigan, Ives & Co. had accepted time drafts of Schlesinger's mining companies to the amount of about $200,000, which drafts were then falling due at intervals of only a few days. Schlesinger's mining companies were unable to meet this paper as it was falling due, and, at Schlesinger's request, Corrigan, Ives & Co. placed in his hands $200,000 of fresh paper to take up the old paper as it fell due, which Schlesinger promised to do, but, as a matter of fact, the old paper was not taken up when it fell due. Upon ascertaining this fact, Corrigan, Ives & Co. telegraphed Mr. Schlesinger to come to Cleveland, and he did so, on the 4th of July, 1893. Schlesinger then stated that he had all of the new drafts still in his possession, and agreed to return them, but he did not do so, and both sets of paper remained out and a charge against Corrigan, Ives & Co. On ascertaining this condition of things, an action was brought by *Stevenson Burke*, one of the defendants in this case, against his copartners, in a proper court at Cleveland, to close up the partnership relations; and in that action one Price McKinney was appointed receiver of the firm of Corrigan, Ives & Co.

On the 18th or 19th of July, 1893, Hirschfeld and Krielsheimer went to Cleveland with the avowed purpose of en-

deavoring to secure the receiver of Corrigan, Ives & Co. for the indebtedness owing them by the Douglas Furnace Company. At that interview Corrigan, Ives & Co. first learned that all of the iron at the furnaces, save about 3,000 tons, was covered by storage warrants. Some hard words were used by the defendant *Burke,* who denounced the issuance of the warrants as a swindle. It is alleged by some of the witnesses that he threatened to make all parties walk the plank. After consultation with attorneys, Mr. Hirschfeld, on the demand of *Burke* and the receiver, McKinney, gave a judgment note representing the whole indebtedness of the furnace company to Corrigan, Ives & Co., and delivered it to the receiver. He also transferred at the same time, as collateral security, about $60,000 worth of book accounts to the receiver, and some other property of small value. On the same day *Corrigan* and *Burke* employed Hirschfeld to work for them at the same rate that he had been employed by the Douglas Furnace Company. Upon receipt of the judgment note, the receiver at once went to Mercer county, Pennsylvania, and entered judgment thereon, and levied upon all the iron in the yard, and thereafter the sheriff sold the same.

The circuit court found that the storage warrants were not issued as security for any debt or demand, but for the purpose and with the intention of vesting title of the pig iron in the Buffalo Mining Company in good faith, and without any intent to defraud the creditors of the furnace company; further, that the intention of the furnace company in the issue and delivery of such storage warrants to the mining company was to make a sale of the iron therein described, and vest the title thereto in the Buffalo Mining Company, so that the mining company might raise money by the sale of said pig iron, or in any manner it saw fit; and that the mining company also had such intention. The court further found that the bank advanced the moneys

Geilfuss vs. Corrigan and another.

aforesaid to the Buffalo Mining Company upon such storage warrants in good faith, and without any notice or knowledge of any infirmity of title. The court further found that *Burke* and *Corrigan* and McKinney concerted together, and, by threats, persuasion, and fraud, procured the execution of the judgment note aforesaid, for the purpose of at once levying on all the property of the Douglas Furnace Company, without regard to the rights of the holders of the storage warrants; and that they had full knowledge, prior to the taking of the judgment, and prior to the levy and sale, of the rights of the Commercial Bank; and that, by their acts, they had converted the 10,800 tons of pig iron which belonged to the bank to their own use; and also that they fraudulently employed Max Hirschfeld as their own agent, so that he could not or would not, prior to the levy, mark and set off to the holders of the storage warrants any particular parts of the pig iron. The court also found the total amount of the value of the iron was $116,800, for which amount, with interest, judgment was entered against the defendants; and from that judgment this appeal has been taken.

For the appellants there were briefs by *W. J. Turner* and *J. E. Ingersoll*, and oral argument by *Mr. Turner* and *Mr. Stephenson Burke*. They argued, among other things, that storage receipts could lawfully be issued only by a warehouseman or company or other person openly engaged in the storage of goods or property for others for hire. The receipts issued in this case were invalid and created no lien. *Bucher v. Comm.* 103 Pa. St. 528; *People's Bank v. Gayley*, 92 id. 518; *Farmers' & M. Nat. Bank v. Long*, 87 N. Y. 209; *Yenni v. McNamee*, 45 id. 614; *Shepardson v. Green*, 21 Wis. 539; *Shepardson v. Cary*, 29 id. 34, 41; *Thorne v. First Nat. Bank*, 37 Ohio St. 254, and cases cited; *Fishback v. Van Dusen & Co.* 33 Minn. 111; *Merchants' & M. Bank v. Hibbard*, 48 Mich. 118; *Rosenham v. Batjer*, 154 Pa. St. 544.

Geilfuss vs. Corrigan and another.

For the respondent there was a brief by *Timlin & Glicks-man*, attorneys, and *James G. Flanders*, of counsel, and oral argument by *Mr. W. H. Timlin* and *Mr. Flanders*. They contended, *inter alia*, that if a sale is valid under the statute of frauds, the fact that the articles sold are a portion of a larger mass of uniform kind and quality does not prevent the title passing to the purchaser, and the purchaser may maintain trover for such aliquot part of the mass. *Winslow v. Leonard*, 24 Pa. St. 14; *Nash v. Brewster*, 2 L. R. A. 409, and cases cited; *Kimberly v. Patchin*, 19 N. Y. 330; *Pleasants v. Pendleton*, 6 Rand. 473; *Gardner v. Dutch*, 9 Mass. 427; *Young v. Miles*, 20 Wis. 615; *Sanger v. Waterbury*, 116 N. Y. 371; *Burrows v. Whitaker*, 71 id. 292; *Kingman v. Holmquist*, 36 Kan. 735; *Carpenter v. Graham*, 42 Mich. 191; *Wagar v. D., L. & N. R. Co.* 79 id. 648; *Chapman v. Shepard*, 39 Conn. 421; *Hurff v. Hires*, 40 N. J. Law, 581; *Watts v. Hendry*, 13 Fla. 523; *Newhall v. Langdon*, 39 Ohio St. 87–95; *Eldred v. Oconto Co.* 33 Wis. 141; *Starke v. Paine*, 85 id. 633. Where a storage receipt has been issued by one who is not a warehouseman, the great weight of authority is that it is valid as against creditors of the person issuing the same if it is issued as an absolute sale. *Gibson v. Stevens*, 8 How. 384; *Kimberly v. Patchin*, 19 N. Y. 330; *Hale v. Milwaukee Dock Co.* 29 Wis. 490; *Merchants' & M. Bank v. Hibbard*, 48 Mich. 118; *Gibson v. Chillicothe Branch Bank*, 11 Ohio St. 311, 322; *Easton v. Hodges*, 18 Fed. Rep. 677; *National Exch. Bank v. Wilder*, 34 Minn. 149; *Siedenbach v. Riley*, 111 N. Y. 560.

The following opinion was filed February 23, 1897:

WINSLOW, J. The so-called storage warrants were not warehouse receipts, either under the laws of Pennsylvania or of Wisconsin. In order to be such, they must be issued by a *warehouseman* or one openly engaged in the business of storing property for others for a compensation. 1 Brightly's

Purd. Dig. (12th ed.), 165, § 1; *Bucher v. Comm.* 103 Pa. St. 528; *Shepardson v. Cary,* 29 Wis. 34. And the fact that the receipt was executed by a warehouseman must affirmatively appear in the evidence. *Shepardson v. Cary, supra.* Not only was there no proof in this case that the furnace company was in the warehousing or storage business, but, on the contrary, the proof was conclusive that it was not in such business, and never had been. The fact that it surreptitiously issued the false receipts in question did not constitute it a warehousing corporation. As well might it be argued that the issuance of counterfeit bank bills constitutes the counterfeiter a bank. It seems that, had the certificates been negotiable warehouse receipts, the bank would have acquired a valid lien upon the iron they represented by the transfer and indorsement of the receipts to it by the Buffalo Mining Company. *Price v. Wis. M. & F. Ins. Co.* 43 Wis. 267; 1 Brightly's Purd. Dig. (12th ed.), 165, § 1. But we may dismiss this question, because they were not such certificates, and the plaintiff obtains no advantage from the fact that they were in the usual form thereof. Nor were the certificates valid as chattel mortgages upon the iron named in them, not only because they are not chattel mortgages in legal effect, but also because by the law of Pennsylvania, as well as by the law of Wisconsin, a chattel mortgage is only valid as to third persons when filed in the proper office, and there is no claim of any filing here. 1 Brightly's Purd. Dig. (12th ed.), 665, §§ 200, 201–214.

Thus, at the outset of the case, it appears that the plaintiff had no interest in or lien upon the iron in question, as indorsee of a warehouse receipt nor as a chattel mortgagee. Nor can it be claimed that the plaintiff actually bought or obtained legal title to the iron. These possible claims being thus eliminated, we know of no other claim which the plaintiff can make, unless it be a claim as pledgee of the iron as collateral to the debts of the Buffalo Mining Company

and of Schlesinger; and this, in fact, is the claim made in the complaint, and the only claim which the evidence tends, to justify. It becomes necessary, then, to consider the question whether the evidence shows a valid pledge. The principles of law governing a pledge of personal property are simple and familiar. To constitute a valid pledge, there must be transfer of possession to the pledgee, actual or constructive. *Seymour v. Colburn*, 43 Wis. 71. A pledge differs from a mortgage in this important respect, namely, that the legal title to the property pledged remains in the pledgor, subject to the pledgee's lien for his debt, while a mortgage passes the legal title to the mortgagee. In the case of a pledge, a lien is created, to the existence of which possession is absolutely necessary; in the case of a mortgage, title passes, subject to be revested by performance of a condition subsequent. Jones, Pledges, §§ 4, 7; *Thompson v. Dolliver,* 132 Mass. 103. Therefore, if the bank had any interest in the iron at the time of its seizure, it was that of a lien thereon, by way of a pledge.

In considering the question of whether it had such a lien which was valid as against the creditors of the furnace company, a brief recapitulation of the essential facts will be useful. Ferdinand Schlesinger owned two corporations,— one, a mining corporation, engaged in mining ore in Michigan; the other, a furnace company, engaged in smelting ore in Pennsylvania. These corporations were nominally furnished with full complements of officers, but in fact the business of each was directed and controlled by Schlesinger as though it were his own. The furnace company had a large stock of pig iron constantly on hand in its yards in Pennsylvania, and was largely indebted to Corrigan, Ives & Co., of whom it purchased its iron. It refused to give Corrigan, Ives & Co. security on the iron, on the ground that such a course would injure its credit. In order to raise money for the furnace company, Schlesinger caused the fur-

nace company to issue apparent storage receipts to the mining company, without consideration, and without agreement to purchase, and without selection or delivery of the property, either actual or constructive, unless the handing over of the receipts be delivery, and with the agreement that the receipts should be returned whenever the furnace company needed them on account of sale of the iron. On receiving the receipts, he borrowed money of the plaintiff bank upon the notes of the mining company, secured by assignment of the receipts as collateral. What was done with all the money so borrowed does not appear. The original purpose seems to have been, as said in respondent's brief, to raise money for the furnace company, and the evidence shows the fact that the mining company was almost daily remitting money in large amounts to the furnace company, as well as the fact that the furnace company was frequently remitting to the mining company. None of the remittances were made in payment of the iron certificates, nor were they ever intended to be applied thereon. The fact seems to be that each enterprise was bolstering up the other as occasion required, or, rather, that Mr. Schlesinger was using the property and credit of his apparently separate concerns indiscriminately, to obtain money as it was needed. It seems probable that much of the money borrowed on the notes of the mining company secured by the receipts in question was forwarded to the furnace company.

The court found that the bank took the certificates innocently, without knowledge of any defect. We cannot probably disturb this finding, because it is based on the affirmative evidence of the cashier who made the loans; but, in view of the facts proven on cross-examination of the cashier himself, this finding seems to be a considerable tax on the credulity. The facts are, in brief, that the cashier was well acquainted with Mr. Schlesinger, so much so that in 1892 Schlesinger put in his hands one share of stock in

the Buffalo Mining Company, in order' that he might become a director of the company, and he was thereupon made a director and secretary of the company, and remained such until April, 1893, when he resigned, and returned his share of stock. This was after the loans on the credit of the receipts had begun to be made. Notwithstanding his high official position in the mining company, he testifies that he "knew nothing of its business," except that it was engaged in mining. We think he could hardly have failed to discover the manner in which Mr. Schlesinger conducted the business of his nominal corporations. However this may be, he knew, as he testifies, that the mining company was engaged in mining ore, and not in buying or selling pig iron. He knew "something" about the furnace company; knew where it was doing business; knew Mr. Hirschfeld, the nominal president; discounted some of the furnace company's paper; obtained general information about it by inquiries through commercial agencies at the time of the pledging of the receipts. In view of all these facts which were within his knowledge, and the facts which he might have ascertained without difficulty by very little inquiry, it seems almost an impeachment of his intelligence to say that he received the receipts in ignorance of any defect or infirmity in them; but we suppose we are bound by the finding, and we shall proceed on that basis.

It is very apparent that, had the certificates remained in the hands of the mining company, they would have constituted no obstacle to creditors of the furnace company in the collection of their debts. They were subject to nearly, if not quite, all the objections which render transfers void as to creditors. They were absolutely false in fact. There was no change of possession of the iron; no payment nor agreement to pay for it; no intention to pass title. They were the merest shams. There was in effect an agreement that the furnace company should remain the apparent owner,

with the right to sell and receive and dispose of the proceeds. of sales, and that it should have the right to call back certificates whenever it needed them for this purpose; and it was further expected that, when the need for borrowing money was over, the certificates should all be returned. The scheme was certainly a brilliant one. If successful, it created a shifting title or interest, which readjusted itself from day to day as the stock changed, automatically attaching to each new pig of iron as it emerged glowing from the furnace, and with equal facility detaching itself from each pig that was sold as it was loaded on the car for transportation to the vendee.  Certainly, if such a scheme could be successful, the inventor should take high rank among a certain class of financiers; and the laws which have been supposed to prevent secret transfers and conveyances in fraud of creditors must be at once revised, or they will pass into the dim limbo of unexecuted and worn-out legislation.

It is seriously and ably argued that the scheme has been successful; that the original transaction has been purged of all objections by the intervention of the innocent third person, in the shape of the plaintiff bank; and thus that the shifting and self-adjusting, but void, title of the mining company has been turned into an equally shifting and delusive, but good, lien for the benefit of the bank,— a lien which is secret and invisible to creditors, but entirely visible and very real to the plaintiff.  As before said in this opinion, the only interest which the plaintiff claims or can claim in the iron in question is that of a lien thereon as pledgee; and, in order to make a valid pledge, there must have been either actual or constructive delivery of the property pledged.  *Bona fides* does not avail the pledgee in the absence of delivery and possession, either actual or constructive.  There was confessedly no actual delivery here, and the only thing that can be claimed to be a symbolical or constructive delivery is the indorsement and delivery of the false receipts.  Hence the

question becomes whether the delivery of the receipts under the circumstances is a constructive delivery of so much iron. Had they been in fact warehouse receipts, the transfer and indorsement thereof by way of pledge would have operated as a sufficient constructive delivery of the property, both by the common law and by the statute. R. S. sec. 4194; *Shepardson v. Cary, supra; Price v. Wis. M. & F. Ins. Co., supra.* Bills of lading and railroad receipts are placed by the statutes of both states on the same footing. See statutes of Pennsylvania before cited in this opinion. The reasons for this rule are very apparent. In such cases the property itself is in the hands of a third person or corporation, instead of in the possession of the vendor or pledgor. Consequently it does not furnish any false basis of credit, nor is any creditor deceived, because it is well understood that goods in the hands of warehousemen or carriers are or may be the property of others, and, by the long usage of trade, subject to just this mode of transfer. No such considerations, however, apply in the case of goods in the possession of the vendor or pledgor, or of some third person who is not a warehouseman or wharfinger, and we know of no rule which makes the mere delivery of a receipt a constructive delivery of the property in pledge in such a case. In *Shepardson v. Cary, supra* (which was an action in equity to enforce a pledge of personal property as collateral, alleged to have been made by means of the transfer of a warehouse receipt), DIXON, C. J., says: "To uphold the receipt as a proper warehouse document transferring the title to the property, and operating as a good *constructive* delivery of it to the vendee, it must in all cases distinctly appear that it was executed by a warehouseman, one openly engaged in that business, and in the usual course of trade." There are numerous examples of constructive delivery in the books, but none, we think, which holds that the facts here constitute such delivery. Constructive or symbolical delivery is permitted because of the difficulty or impossibility in some cases, of actual delivery.

Thus, where the goods are very bulky, as logs in a boom, delivery may be made by pointing them out to the pledgee; or, where they are goods in a warehouse, by a delivery of the keys; or, where a savings, bank deposit is to be pledged, it may be done by delivery of the pass book. *Jewett v. Warren*, 12 Mass. 300; Jones, Pledges, §§ 36, 37; *Boynton v. Payrow*, 67 Me. 587. So, also, where goods are in possession of a third person, and the pledgor gives an order on the custodian to hold the goods for the pledgee, which is brought to the knowledge of the custodian, it seems that this would be a sufficient delivery and change of possession. *Whitaker v. Sumner*, 20 Pick. 399; *Tuxworth v. Moore*, 9 Pick. 347. In all these cases it will be readily seen that the property is placed beyond the control of the pledgor, and is not being used to maintain an appearance of wealth by either the pledgor or others with the consent of the pledgee.

In the present case there is no such element. The pledgee never saw or attempted to see the iron described in the certificates, and made no inquiries concerning it. It never notified the furnace company that it held any certificates in pledge, or claimed any interest in any iron in its possession. It tacitly allowed the furnace company to go on in its business for months, selling out the very iron nominally covered by the certificates, and replacing it with other iron, and collecting and using the proceeds of its sales. There can be no constructive or symbolical delivery and continuance of possession logically claimed where such a state of facts appears. Conceding that the title to the iron was in the mining company, the furnace company was the custodian, and the custodian received no notice of pledge, made no agreement to hold for the benefit of the pledgee, but went on in business, selling the property, and substituting other property in its place, with no one to hinder or make it afraid. Apparently the owner of more than 20,000 tons of iron, it was (if plaintiff's theory is correct) really not the owner of it in case a creditor appeared with an execution. It was held in *Casey*

*v. Cavaroc*, 96 U. S. 467, that where property alleged to have been pledged has at all times been in the actual possession of the pledgor, with authority to dispose of it and substitute another article of equal value in its place, there exists no pledge as against third persons. No reason is perceived why this is not wholesome doctrine, nor why it does not apply with equal force to possession by a third person, with power of sale and substitution, as in the present case. Our conclusion is that, as against third persons, the bank never perfected its pledge by obtaining possession, either actual or constructive, of the iron named in the certificates, and hence that it cannot maintain this action.

The trial court found that the judgment note was obtained by threats and fraud, for the purpose of at once levying on the property of the furnace company. We have found no evidence in the case which establishes fraud or duress. There was some excited language, but nothing amounting to duress or fraud. Corrigan, Ives & Co. had a right to obtain a judgment note for the very purpose of entering judgment at once, and levying upon the furnace company's property. Such is frequently the purpose for which judgment notes are taken, and such purpose does not, of itself alone, constitute fraud or vitiate the note.

We do not find any evidence that justifies the finding that the defendants fraudulently employed Hirschfeld, so as to prevent him from marking off particular lots of iron to the holders of storage warrants. There is nothing to show that Hirschfeld intended to do so, or that the plaintiff or any one else expected or wished him to do so. Whether he would have done so or not had he not been employed by the defendants is purely a subject of speculation.

These views necessitate reversal of the judgment.

*By the Court.*— Judgment reversed, and action remanded with directions to dismiss the plaintiff's complaint.

A motion for rehearing was denied, April 30, 1897.