No. 28,670.

THE PENALOSA STATE BANK, *Appellee*, v. THE CALISTA GRAIN AND MERCANTILE COMPANY, *Defendant;* A. L. SAYLOR, *Appellant.*

(276 Pac. 70.)

Opinion filed April 6, 1929.

*C. M. Williams, D. C. Martindell* and *W. D. P. Carey,* all of Hutchinson, for the appellant.

*Clark A. Wallace* and *Paul R. Wunsch,* both of Kingman, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action in conversion of the proceeds of a crop of wheat. The plaintiff bank claimed the crop and its proceeds by virtue of a contract with the farmer who planted, harvested and delivered it to an elevator company. The defendant, A. L. Saylor, claimed and obtained the proceeds of the crop from the elevator company by virtue of a chattel mortgage which the farmer had given him soon after it was planted.

The material facts were these: In the summer of 1926, one C. C. Cain, a Kingman county tenant farmer, was so heavily burdened with debt that he had not sufficient credit to buy seed wheat, although he held under some sort of tenure about 400 acres of land suitable for wheat growing. He was also confronted with the dilemma that if he could procure some seed wheat and sow it on his own account his more insistent creditors would *attempt* to subject the crop to attachment and execution as soon as it sprouted and appeared above ground. Cain owed the plaintiff bank about $2,200, and it held a chattel mortgage on his farming equipment. The bank also held a chattel mortgage on some 400 or 500 bushels of Cain's 1926 wheat crop which was stored on Cain's premises. To enable Cain to put out a crop in the autumn of 1926, he and the plaintiff made a written contract whereby this stored wheat held on the bank's mortgage should be surrendered to the bank as part payment on what he owed, and that the bank would furnish so much of it as would be needed to seed the wheat lands under Cain's control. The agreement provided that the crop should belong to the bank, but that as soon as it was sprouted and through the ground so as to furnish a tangible basis of security as a chattel mortgage the bank would sell Cain the wheat it had thus furnished and surrender its interest in the crop to him and take in lieu thereof a chattel mortgage on the crop in payment for its seed wheat and as further security for what he already owed the bank.

Cain set about the performance of this contract and sowed the bank's wheat, but he never sought to exercise his option to buy the wheat and thus acquire for himself the bank's interest in the crop under the terms of the contract. On the contrary, shortly afterwards Cain gave the defendant a chattel mortgage on 110 acres of this young wheat crop on the assumption and pretense that it was already his own property. Defendant recorded his mortgage; and

when the crop was grown, threshed and placed in the elevator the following July, he claimed the proceeds under his mortgage, and notwithstanding the elevator company knew of plaintiff's claimed ownership of the wheat, as did the defendant (although the latter apparently did not know of such claim until after he had obtained and recorded his chattel mortgage), the elevator company handed over to defendant the entire proceeds of the wheat crop grown on this 110 acres, except the amount due the landlord, of no present concern.

Hence this lawsuit; jury waived; trial by the court; findings of fact and conclusions of law in favor of the bank; judgment accordingly.

Defendant appeals, his main contention being that the bank did not own the wheat. In determining this point it seems necessary to quote at length from the agreement between Cain and the bank:

"This agreement made and entered into this July 30, 1926, by and between C. C. Cain, party of the first part, the Penalosa State Bank, Penalosa, Kansas, party of the second part.

"Witnesseth: That party of the first part [Cain] is indebted to the second party and is desirous of putting out a wheat crop during the fall of 1926; and that party of the first part is indebted to other parties who are threatening attachment proceedings upon first party's property; that said second party has certain wheat first party has delivered in his bin and to said second party, which second party desires to have sown; that said second party will not furnish as seed wheat to said party to sow as his own wheat.

"In consideration of the above and mutual covenants herein contained, first party agrees to sow 460 acres more or less of wheat for said second party on the following-described land, to wit:

"110 acres on S. E. ¼ section 10-27-9.

[And other lands described.]

"Second party to furnish sufficient seed. First party agrees to sow said wheat for second party as early as possible and in a good workmanlike manner; that said wheat when sown shall be the absolute and sole property of the second party. Upon completion of the sowing of the said wheat as above described, said party of the second part agrees to sell same to party of the first part who agrees to buy same, and to pay second party in cash therefor or to execute a first and prior mortgage thereon in payment of said wheat and which mortgage shall also secure other indebtedness owing second party by first party and the sale price of the said wheat shall be the reasonable value of the same."

Defendant asserts that this contract was void for four reasons—want of consideration, fraudulent as to Cain's creditors, unconscionable, and never intended to be fulfilled.

Touching these points in order, it can hardly be said that the contract was wanting in consideration. By entering into it and sowing the bank's wheat Cain obtained an option to buy the bank's interest at a very moderate figure, and by the exercise of that option he would acquire a crop of wheat which might go far towards the extinguishment of the burden of debts which were paralyzing his farming activities. Neither does it seem proper to characterize the contract as fraudulent in its tendency to assist Cain to defeat his creditors. How could the contract have that effect? Unless the bank would furnish the wheat there would be no crop planted, and consequently no possibility of a harvest and wherewithal to pay any of Cain's creditors. It seems that the contract could not be otherwise than beneficial to Cain's creditors, at least to one or more of them, and it certainly could not result detrimentally to any of them. Defendant's argument on this point takes it for granted that Cain could and would have acquired some seed wheat of his own and sown it for the general benefit of all his creditors if the bank had not consented to have him sow its wheat, but there was no evidence to that effect, and the contract itself recognized the circumstances which had put a period on Cain's farming operations except under some such arrangement as he effected with the bank.

It is also urged that the contract was unconscionable. Why so? There is nothing particularly invidious nor unusual in our wheat-growing sections about a contract where one party risks his seed wheat against the other party's labor of preparing the ground and planting it, both parties to have an interest in the crop, if there is one. Here it seems the bank was somewhat more generous than the usual run of men who furnish seed wheat on shares. It stipulated that as soon as the young crop was far enough along to be a proper subject of sale and hypothecation it would sell its interest to Cain for the fair price of its seed wheat, provided he would pledge the crop to the bank to secure the large sum of money he already owed it. If the seed had died of drought Cain would have been out nothing, and the bank could charge off the value of its seed wheat to profit and loss. There is nothing in law or morals or common fairness which would forbid that sort of a contract. Courts look with favor upon contracts which encourage the growing of crops, "which being a public benefit," as the old law writers declared, "tending to the increase and plenty of provisions ought to have the utmost security

and privilege that the law can give it." (Cooley's Blackstone, Book II, 122; *Bank v. Jesch,* 99 Kan. 797, 800, 163 Pac. 150.) Agreements touching the respective interests of parties contributing to the growing of a crop are valid. (*Dodson v. Covey,* 81 Kan. 320, 105 Pac. 579; *Dannefer v. Aurand,* 106 Kan. 605, 189 Pac. 371.) So far as getting itself some advantage over Cain's other creditors by this contract, it is familiar law that a diligent creditor violates no man's right by looking out for his own interest, and he does not need to hold back out of mere courtesy to others who also have demands against his debtor. (*Brecheisen v. Clark,* 103 Kan. 662, 176 Pac. 137.)

The fourth objection to the contract was that it was never intended to be fulfilled. It did afterwards transpire that perhaps Cain never intended to exercise his option to acquire the crop and mortgage it to the bank, since he did not do so, but did mortgage it to defendant without the formality of acquiring it. But there is not a syllable of evidence nor evidential circumstance which tended to prove that the bank did not intend to carry it out. It did carry it out as far as was necessary for it to become the owner of the young crop; and it was the owner of it, subject to Cain's option, when defendant procured the mortgage from Cain; and as Cain did not then own the crop and never performed the requisite stipulations whereby he might acquire it, defendant's mortgage from Cain conferred upon him no title to the crop nor to its proceeds nor any interest therein.

It was contended, however, that whether plaintiff was the owner of the crop or not, defendant was not guilty of converting it or its proceeds, defendant's idea being that he never had the wheat in his possession and never exercised any dominion over it, and that the sale of the wheat was by Cain himself; and that he (defendant) had a right to receive his due from Cain regardless of what right or lack of right Cain had to sell the wheat; and that it was no concern of defendant's however or wherever Cain raised the money to pay him; and that if Cain did not own the wheat mayhap the elevator company still owes the bank notwithstanding it has already paid defendant therefor. This argument is plausible but unsound. That there was a conversion of plaintiff's wheat crop is scarcely controverted. Of course Cain converted it. But not Cain alone. All who coöperated with him to that end were likewise guilty of its conversion. The elevator company participated in that conversion, and

it, too, of course, would be liable. (We understand from the record that both Cain and the elevator company have since gone through bankruptcy, which is unfortunate for both these litigants.) But the fact of most importance at present is that defendant also aided and abetted in the conversion. In company with Cain's wife, who apparently went along to give strengthened color to his claim of right, he went to the elevator and demanded and received from the elevator company the entire proceeds of this 110 acres of wheat (less the landlord's portion). He received $1,214. When he took that money he knew he had no right to it. He knew it belonged to the bank. Moreover, he assumed the rôle of disbursing functionary, not only to pay himself what Cain owed him, $850, but also to disburse the remainder of the proceeds to others for harvesting expenses and the like. Defendant himself testified:

"At the time I was paid the $1,200 I just went down there and told him I came down for the settlement for the wheat on the Tennal place. [110 acres.] He said, 'All right.' This talk was with Mr. Parsons. [Manager of the elevator.] He said 'All right' he would figure it up and pay me. He asked me about taking out the cash rent. I said the cash rent went to Mr. Tennal. He should pay that to Mr. Tennal, so he took out the $150 and gave me this $1,215 as evidenced by this check.

. . . . . . . . . . . . .

"Mr. Parsons did not come to me a time or two and try to get me to turn this money back to him. He asked me what I was going to do about it. I said I ain't going to do anything about it."

The court feels bound to hold that the evidence tended to show that defendant actively participated in the conversion of the crop and its proceeds.

Touching the point of law that the mere receipt of the proceeds of the sale of the wheat would not render defendant liable as for a conversion, that point might be important if the sale had been lawful. If Cain had the right to sell the wheat and had paid the proceeds to defendant, the fact that Cain was morally bound to hand the money over to the bank would not render defendant liable as for conversion. But the rule contended for has no application to the situation we are considering—where the sale of the wheat was illegal. It was not Cain's wheat, but the bank's. Defendant had no right to meddle with the wheat or knowingly with its proceeds. (*Barnhart v. Ford*, 37 Kan. 520, 15 Pac. 542; *Brown v. Campbell*, 44 Kan. 237, 241-247, 24 Pac. 492.) In *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.*, 120 Kan. 21, 24, 245 Pac. 734, a railway carrier de-

livered a car of wheat·to a grain dealer without requiring a surrender of the bill of lading. The dealer sold the wheat to a milling company which paid the grain dealer therefor. It never accounted to the plaintiff shipper for the proceeds. Suit· was begun against the railway company, the grain dealer and a milling company. All three were held liable as for conversion. This court said:

"It appears that all of the defendants participated in the wrongful appropriation of plaintiff's wheat. All knew that it had been delivered without the surrender of a bill of lading, and with this knowledge each contributed its part to the misappropriation and their joint work occasioned the loss. Each party who took possession of the wheat, whether by purchase or otherwise, from one who had no power from the owner to dispose of it, is guilty of a conversion, and all who assist in the wrongful appropriation and disposition or shared in the proceeds thereof with guilty knowledge are guilty of a conversion and all are jointly and severally liable even though all may not have been equally guilty." (Citations.)

In *Gooch v. Gooch*, 108 Kan. 416, 195 Pac. 874, it was said:

"If separate and independent acts of wrongdoers combine to produce a single injury, each is responsible for the result although the wrong of one alone might not have produced the result." (Syl. ¶ 3.)

In *Velsian v. Lewis*, 15 Ore. 539, 3 A. S. R. 184, where defendants were held liable as for conversion of 412 bushels of wheat which they had innocently purchased from one who did not own it, on defendants" behalf it was argued:

"But the contention of counsel for the defendants is, that where the purchase is made in good faith, although from one without title, and the possession is taken from one rightfully in possession, that the action of trover for a wrongful conversion is not maintainable without previous demand before suit, unless some subsequent acts of the purchaser make him guilty of a conversion." (p. 541.)

The exhaustive opinion of the court completely demolished this argument, but we can only take space to quote:

"At first blush, it may seem strange that one who takes possession of goods or chattels under a contract of purchase, from one who had no right to sell, should be treated as a wrongdoer; but the explanation of the principle lies in the common-law maxim *caveat emptor,* which applies to the transfer of personal property. It is the buyer's own fault, if he is so negligent as not to ascertain the right of the vendor to sell, and he cannot successfully invoke his *bona fides* to protect himself from liability to the true owner, who can only be divested of his rights or title to his property by his own act, or by the operation of law. Every person is bound at his peril to ascertain in whom the real title to property is vested, and however much diligence he may exert to that end, he must abide by the consequences of any mistake. . . . In

such case, good faith, or the absence of evil intent, cannot infuse validity into the transaction, nor make a possession rightful which is exercised in derogation of the rights of the true owner to control and enjoy his property." (pp. 541, 550.)

In *Farmer T. & H. v. Bank,* 130 Ia. 469, syl. ¶ 2, it was held: "One who participates in a wrongful sale of mortgaged property, receiving the proceeds of a portion thereof, is guilty of conversion, and he is not relieved by the good faith of his acts."

A final objection that certain special findings which entered into the judgment were not supported by any evidence is untenable. Moreover, most of the facts involved in special findings were scarcely matters of *bona fide* dispute. There never was any seriously controverted fact in this lawsuit for the litigants to quarrel about. The crucial question throughout was one of law—whether the contract between Cain and the bank was valid, and what were the consequences attaching to the invasion of plaintiff's rights by Cain, the elevator company, and by the defendant, once that question was properly determined.

The matter of Cain's bankruptcy and the attitude of plaintiff and defendant in respect thereto, as disclosed by the record, have been duly considered, but need no discussion further than to hold, as we do, that the rights and liabilities of the parties to this appeal were not affected thereby.

The judgment is affirmed.