No. 32,881

ROY KIPP, *Appellee*, v. GOFFE & CARKENER, *Appellant*.

(58 P. 2d 102)

Opinion filed June 6, 1936.

*A. M. Ebright, P. K. Smith, Bernard Peterson* and *Alfred B. Williams,* all of Wichita, for the appellant.

*R. F. Crick, M. C. Bucklin,* both of Pratt, *C. H. Brooks, Howard T. Fleeson, Fred W. Aley, Carl G. Tebbe, Wayne Coulson* and *Paul R. Kitch,* all of Wichita, for the appellee.

*Arthur Hurd,* of Abilene, *E. R. Morrison, Homer H. Berger* and *D. C. Johns,* all of Kansas City, Mo., as *amici curiae.*

The opinion of the court was delivered by

HARVEY, J.: This was an action for the conversion of wheat al-

leged to have been stored in an elevator, the manager of which sold it through a grain company. A jury trial resulted in a judgment for plaintiff against the grain company. It has appealed.

In 1933, and for several years prior thereto, L. M. Dillon, doing business as the L. M. Dillon Grain Company, operated two grain elevators situated on the right of way of the Missouri Pacific Railroad at Iuka in Pratt county. One of these had a capacity of 9,500, the other of 10,500 bushels of grain. In an average year Dillon took in from 75,000 to 100,000 bushels of wheat; in 1933 from 40,000 to 50,000 bushels. This wheat was delivered to him by wheat-growing farmers in the vicinity. He had never complied with our statutes authorizing him to be a public warehouseman. He testified that he received wheat under three types of contract: (1) An outright purchase of the wheat at the time it was delivered, and which was paid for at the market price of that date; (2) under a contract by which he purchased the wheat and became the owner of it, but agreed to pay for it at some future date to be chosen by the seller, and at the market price of that date; and (3) he received wheat for storage for those who preferred to store their wheat rather than to sell it. We pass for the moment his testimony indicating the second and third of these methods were substantially the same. He shipped most of this wheat to Goffe & Carkener, a corporation, at Wichita, engaged generally in the business of buying and selling grain. The evidence indicates there were three types of contract under which those shipments were made: (1) An outright sale by Dillon to Goffe & Carkener; (2) shipments were made on consignment, the wheat to be sold by Goffe & Carkener and the proceeds remitted to Dillon, and (3) by what is spoken of as proposition A. Under this plan Dillon consigned the wheat to Goffe & Carkener, who found a buyer for it willing to advance to within five cents a bushel of the then market price and to make settlement at some future date named by Dillon at the market price of that date. On all the wheat consigned to Goffe & Carkener under plans 2 and 3, just mentioned, that company was paid a commission of one cent per bushel. Without regard to the type of contract under which the shipments were made Dillon always estimated the amount coming to him, drew a sight draft on Goffe & Carkener for the amount, and attached the bill of lading to it so that Goffe & Carkener had to pay the draft before disposing of the wheat. Differences between the amount of the draft and the final

proceeds of the shipment were accounted for later. Dillon received full payment for all the wheat he shipped to Goffe & Carkener.

The plaintiff Kipp contends that he delivered his wheat to Dillon under a contract of storage; that the relation between them was that of bailor and bailee; that the title to the wheat never passed from him; that it was still his wheat when Dillon shipped it to Goffe & Carkener, and that by selling the wheat and remitting the proceeds to Dillon, Goffe & Carkener became liable to him as for conversion. Upon this view of the transaction there is authority to sustain the liability of Goffe & Carkener. (See 3 R. C. L. 142; 6 C. J. 1128, 1129, 1147, and cases there cited.)

Appellant contends that under the facts disclosed by the record and the law applicable thereto the transaction between plaintiff and Dillon amounted to a sale of the wheat, with payment to be made at a future date; that the relation between plaintiff and Dillon by reason of that transaction was that of debtor and creditor; that Dillon had title to the wheat, and when he sold it to or through Goffe & Carkener and received payment there was no further liability to Dillon or to Kipp. Appellant further contends that under the facts shown by the record Kipp is estopped to make the contention that Dillon had no authority to sell the wheat. Appellant also contends the record disclosed trial errors which in any event require a reversal for a new trial, but in our view of the case it will not be necessary to examine these.

The principal controversy between the parties is whether the transaction between plaintiff and Dillon was a bailment or a sale. A fuller statement of the record will enable us better to understand it. The amended petition is in two causes of action; the first for the conversion of wheat delivered by the plaintiff, Roy Kipp, to Dillon; the second for the conversion of wheat delivered by his father, Hiram Kipp, to Dillon, the claim for which was assigned to plaintiff. Dillon was made a party defendant, but he filed no answer, made no defense, and no judgment was rendered against him. He was called as a witness for plaintiff.

Dillon's testimony disclosed that he formerly operated the elevators for one Carlson, who withdrew in 1931, since which time he had been in sole charge; that his method of receiving and shipping wheat had been substantially the same since he had been operating the elevators; when he bought and paid for wheat, as it was delivered to him, no tickets were issued to the person who de-

livered it; or, if so, they were marked paid. If he bought it to be paid for in the future a written contract, in duplicate, was signed by the seller and himself. This was dated and recited that Dillon bought and a named seller sold certain described grain; the seller acknowledged the receipt of any money paid thereon; the buyer agreed, on presentation of the seller's copy of the contract, at some future date selected by the seller, to pay for the grain the market price at Iuka on that date, deducting sums previously paid, and "From this price the buyer shall make a further deduction of 1¢ per bushel per month or fraction thereof intervening between the date of this instrument and the date of payment." It further recited that upon the execution of the instrument the grain described became the property of the buyer, and it fixed a date within which settlement must be made. He testified when he bought wheat on such a contract scale tickets were given to the seller, but the price was not marked thereon; these tickets were marked with some abbreviation of the word "storage," as "s," "st.," "stor.;" also that he kept a seller's ledger account so as to show each load delivered under the contract, and that he marked the ledger entry of each load "storage." This referred to the one cent per bushel per month mentioned in the contract. Sometimes wheat growers did not want to sell their wheat when they delivered it, but wanted to store it. He accepted such wheat for storage, issued scale tickets marked with some abbreviation of that word, but without a price; and he also marked the customer's ledger account with the word "storage," or some abbreviation of it. Thereafter, if the person who had stored wheat with him wanted it back, he came and got it, or part of it; a few wanting wheat to sow had done so. Ordinarily the person came in later and‧sold him the wheat and he paid or settled for it at the market price of that date. Frequently when a person stored wheat with him he later had the party sign the written sale contract. The matter was handled about the same way whether the sale contract was signed or not; the wheat was paid for on the date the customer or seller selected, at the market price of that date, and one cent per bushel per month storage was deducted.

Dillon handled the wheat the same in either event; that is, he mingled it with other wheat in his elevators, if that was what he wanted to do; he kept none of it separate as to who delivered it to him, and he sold it as his own wheat when he wanted to sell it, and to whomsoever he wanted to sell it, and without telling his

buyer that the wheat belonged to someone else; he drew sight drafts and received settlement as though he were the sole owner. He testified he told Goffe & Carkener's representative, several times in 1931, 1932 and 1933, that he would have stored wheat and asked him about how it should be shipped, and was advised by them that "proposition A" was as good a way as any to ship stored wheat. We do not understand from the record the fact wheat was shipped under proposition A necessarily meant it was stored wheat; that method of shipment simply referred to the method of the sale of the wheat shipped, and more specifically, the time of determining the price and making settlement. "Stored" wheat might have been shipped by any of the plans used in shipment, and probably was shipped by each of them. The shipping record shows a shipment under proposition A on January 3, 1933, and the next one on June 6 of that year. In the meantime there were four shipments sold direct and five shipped on consignment. The earliest any wheat involved in this action was delivered to Dillon was January 13, 1933, and all of it was delivered before March 1 of that year. Dillon testified he shipped out all the wheat he had in his elevators that spring before the first of June in order to have his elevators cleaned up for the new harvest. This indicates that none of the wheat in controversy in this action was shipped by him under proposition A. On the whole, the shipment of wheat under proposition A has no material bearing in this action.

With respect to the wheat in controversy in the first cause of action Dillon testified that when plaintiff brought the first load of the wheat to the elevator he asked plaintiff if he wanted to sell his wheat or store it. Plaintiff replied he wanted to store it and asked if the storage rates had been cut, and was told "No." After this conversation plaintiff hauled in the wheat and received his scale tickets. Dillon received the wheat and put it where he wanted it in the elevator. He does not know that plaintiff ever paid any attention to where he put it, or was even in the elevator. Later he shipped this wheat out to the appellant. With respect to the wheat involved in 'the second cause of action he testified that Mrs. Hiram Kipp came to his office shortly before the wheat was brought in and asked him if she could store some wheat. He told her that she could and that the storage would be one cent a bushel per month. After that conversation Hiram Kipp delivered the wheat and received the scale tickets. He paid no attention as to how the wheat was handled in

the elevator. Later Dillon shipped this to appellant. By the fall of 1933 Dillon became financially involved and his elevators were closed November 28. At that time they had no wheat in them.

The plaintiff testified that when he took the first load of his wheat to the elevator Dillon asked him if he wanted to sell it or store it. He replied he wanted to store it and asked if a cut had been made in the storage charge, and was told no, it would be a cent a bushel a month. He then hauled his wheat in and got scale tickets for each load. He had an elevator on his farm where he had been storing the wheat until he started to haul it to Dillon. He had been hauling wheat there for several years. Sometimes he got the money for it when he delivered it; sometimes he took his tickets and later in the year, when he was satisfied with the price, he would take the tickets to the elevator and sell his wheat, or get his money for it. He determined the time to take the tickets in by the fact the market price was about as high as he thought it would be. On cross-examination he reluctantly admitted that he had told someone who was investigating the matter for appellant about the time the action was brought, that he had no agreement for the return of his wheat; that if he had wanted it back he would have kept it in his own elevator; that the only thing he expected was the market price of the wheat on the day he wanted to settle for it, and the fact that he received the scale tickets rather than the sale contract made no difference, since the transaction was the same. On redirect examination he said he was not under oath when he made that statement, and further he didn't know the person making the inquiry of him was doing so for the benefit of appellant.

Mrs. Hiram Kipp, who it seems looked after some of the details of business transactions for her husband, testified she went to see Dillon shortly before the wheat in controversy in the second cause of action was delivered, and asked him if Mr. Kipp could bring some wheat down and store it, and how much he would have to pay for storage; and was told that he could bring it, and that the storage would be one cent per bushel a month until Mr. Kipp was ready to sell it, and that thereafter the wheat involved in this cause of action was delivered and the scale tickets issued. They had delivered wheat to Dillon on similar terms ever since he had been buying wheat there, and had never hauled any back from the elevator. Later, when the price suited them they would go and sell the wheat and receive the pay for it. This deal was handled about like the previous ones.

This evidence standing alone is hardly sufficient to support a verdict for plaintiff. (See *Bonnett v. Shipping Association,* 105 Kan. 121, 181 Pac. 634.) But it cannot be considered as standing alone; it must be considered in the light of pertinent statutes (Laws 1931, ch. 194, R. S. 1933 Supp. 34-223 *et seq.*) relating to warehouses for the storage of grain for the public. The inspection, grading and storage of grain for the public long has been recognized to be of such importance as to be affected with the public interest, and subject to reasonable statutory regulations by state legislation. Warehouses and bailments generally were recognized early in our legislative history. (G. S. 1868, ch. 58.) In 1872 corporations were authorized to be formed "for the construction and maintenance of warehouses, elevators and granaries." Many sections of the act (Laws 1872, ch. 206) pertain to the storage of grain, issuing receipts therefor, and the rights of the parties with respect thereto. Warehouses for the storage of grain were classified as public and private, and those terms were defined. By 1891 the necessity of grain inspection was recognized, and an act (Laws 1891, ch. 248) was passed to regulate warehouses, the inspection, grading, weighing and handling of grain, and for the appointment of the grain inspector. Warehouses and elevators having a capacity of as much as 75,000 bushels, doing business for compensation, in which grain was stored in bulk, and that of different owners mixed, were declared to be public warehouses and were required to get a license from the board of trade of the nearest city before transacting business as public warehousemen. A bond was required conditioned for the faithful performance of duties imposed, and penalties were provided for the violation of the provisions of the act. This act was amended by chapter 138 of the Laws of 1897, and both were amended by chapters 325 and 326 of the Laws of 1903. In 1907 there was a general revision of the prior legislation on this subject and a new statute enacted (Laws 1907, ch. 222). This defined (§ 19) a public warehouse to be any elevator or warehouse in the state, doing business for compensation, in which grain is stored in bulk and that of different owners mixed or stored in such a manner that the identity of different lots or parcels cannot accurately be preserved. The proprietor of such a warehouse, before transacting such business, was required to get a license as a public warehouseman from the state grain inspector. He also was required to give a bond for the faithful performance of his duties as a public ware-

houseman. Transacting such business without having procured the license and giving the bonds subjected one to severe penalties. The act also provided for warehouse receipts, for keeping a record of them, and pertained to the rights and duties of the respective parties. In 1915 (Laws 1915, ch. 229) several sections of earlier statutes relating to inspecting and storing grain were amended, and among others section 19 of chapter 222 of the Laws of 1907 was amended to include in the definition of public warehouses all elevators or warehouses storing grain situated on or adjacent to the right of way of any railroad company. This further was amended by chapter 200 of the Laws of 1921, and again by chapter 147 of the Laws of 1923. In our Revised Statutes of 1923 all our statutes then in force specifically relating to the inspection, handling and storing of grain in public warehouses were collected in chapter 34, article 1 of which contained the sections relating to inspection, and article 2 those specifically relating to the storage of grain in public warehouses. In 1931 article 2 of chapter 34 of the Revised Statutes of 1923 was revised generally. (Laws 1931, ch. 194.)

In the meantime several acts pertaining to warehouses generally had been enacted containing some provisions applicable to the storage of grain. For example, see chapter 224 of the Laws of 1905, amended by chapter 186 of the Laws of 1911. Our legislature also enacted the "warehouse receipts act," which had been drafted by the commission on uniform laws (Laws 1909, ch. 262), and supplemented that by a later act (Laws 1927, ch. 340), which specifically provided (§ 11) that it shall not be construed as in any way affecting, altering, or amending chapter 34 of our Revised Statutes of 1923. So, while these general warehouse acts appear to overlap some of the sections of our statutes hereinbefore referred to relating to the inspection, handling and storage of grain, the legislature has kept them fairly well segregated.

Chapter 194 of the Laws of 1931, R. S. 1933 Supp. 34-223 *et seq.*, was in force during the time of the transactions involved in this action, and we regard it as being the statute necessary to be considered in connection with the evidence in this case in determining whether plaintiff stored or sold his wheat to Dillon. As we have seen, this is the latest revision of a series of statutes beginning in 1891 by which the state, in the public interest, has undertaken to regulate the inspection, grading, weighing, handling and storage of grain, including public warehouses therefor—what constitutes such

warehouses, under what conditions they may be operated, the issuance and keeping a record of warehouse receipts, and the rights and duties of the respective interested parties in relation thereto. The earliest of these applied only to elevators of more than 75,000 bushels capacity; a later one applied to all elevators in which grain is stored in bulk, mixed as to ownership; a later one included all elevators situated on or adjacent to a railroad right of way, and required the proprietors of such elevators to comply with the statutes and regulations governing public warehouses. Chapter 194 of the Laws of 1931 is entitled, "An act to provide for storage of grain in state licensed warehouses and under state supervision and issuance of warehouse receipts therefor, and, providing penalties for offenses thereunder, and repealing article 2, chapter 34, . . . Revised Statutes of Kansas for 1923 . . ." Section 1 is devoted to definitions, and in part reads: ". . . 'Public warehouseman' means a person lawfully engaged in the business of storing grain for the public." Section 2 reads: "The term public warehouse, as used in this act, shall be deemed to mean every elevator or other building on or adjacent to the property of any railroad in which grain is received for storage or transfer for the public." Sections 3 and 4 contain the distinguishing definitions of terminal and local public warehouses. Dillon's elevators, if public warehouses at all, would be local public warehouses under such definitions. Section 5 reads: "Whenever any grain has been received in any public warehouse, as in this act defined, located in this state, and same is not purchased by the lessee, owner, or manager of such warehouse, such grain shall be considered stored grain." Section 6 in part reads: "Any person desiring to engage in business as a public warehouseman in this state shall, before the transaction of any such business, . . ." make application for and procure a license to transact such business. He is also, by section 7, required to give a bond to the state for the benefit of all persons interested, in a determinable amount, with a good corporate surety, conditioned for the faithful performance of his duties as a public warehouseman. Upon receiving the application and bond the state grain inspector is required to inspect the warehouse described in the application, and if he finds it suitable for the storage of grain, and that the applicant agrees to abide by the terms of the act and the rules and regulations prescribed thereunder, he is authorized to issue a license for the applicant to operate a public warehouse, which license must be posted in

a conspicuous place in the office room of such warehouse. Section 9 makes it an offense, punishable with severe penalties, for any person to "transact any public warehouse business at any terminal or local public warehouse, without first procuring a license for such warehouse, as hereinbefore provided, or without having such license displayed in the office room of said warehouse." Other sections of the statute need not be specifically mentioned, as they are not directly involved in this action. Under this statute the operator of a local elevator on or adjacent to the property of a railroad company was not compelled to make application, give bond, and receive a license as a local public warehouseman, as he was under the last prior statute relating thereto. (Laws 1923, ch. 147, R. S. 34-201.) It became optional with him whether he became a public warehouseman, but he could not be a "public warehouseman" without complying with the law. The evidence clearly shows—indeed, it is conceded—that Dillon had not complied with the law so as to become a local public warehouseman. He therefore had no right or authority to receive grain for storage or transfer it for the public and to issue warehouse receipts therefor. This is a business the state is regulating by statute, as it has a right to do, since it is a business affected with the public interest. Dillon was not a "public warehouseman" for the simple reason that he was not "a person lawfully engaged in the business of storing grain for the public." Appellee is forced to argue that he did this business unlawfully. To that it is sufficient answer to say the statute forbids that to be done. He could store grain for the public and thus do a public warehouse business only in one way, and that is the way the statute prescribes.

A similar question was before the Louisiana supreme court recently in *Supervisor of Public Accounts v. Patorno W. & D. Corp.*, 181 La. 814, 160 So. 423, where the court had to construe a statute much like the one before us, except that it pertained to the storage of goods, chattels, merchandise and crude petroleum. It defined a public warehouseman as one "lawfully" engaged in storing such goods, and as a condition precedent to his doing such business, required him to make application, give bond, and procure a license. He had done this and had procured a license to operate a public warehouse at a specified location. He stored wines at another location and issued a warehouse receipt therefor. The court held the warehouse receipt to be void because of the lack of power or authority of the warehouseman to issue it. Generally, it is held that ware-

house receipts are invalid when issued by one who had no right or authority to issue such receipts. (*Geilfuss v. Corrigan and another,* 95 Wis. 651, 70 N. W. 306; *The Bell & Coggeshall Co. &c. v. Kentucky Glass Works, &c.,* 20 Ky. L. 1089, 48 S. W. 440; *Rodgers v. Murray,* (Tex. Civ. App.), 247 S. W. 888; *The Franklin National Bank et al. v. Whitehead et al.,* 149 Ind. 560, 49 N. E. 592.)

Appellee argues the failure of Dillon to give the bond would not defeat a recovery in this case, citing *Torgerson v. Quinn-Shepherdson Co.,* 161 Minn. 380, 201 N. W. 615. That case may be distinguished from the one before us. There it appears the elevator had made application and procured a license. It had issued the warehouse receipt. However, it had not given the bond required to be given annually by Minnesota General Statutes of 1923, § 5071. In an action involving the validity of the warehouse receipt it was contended the elevator was not a public grain elevator and therefore the attempted storage therein was a sale. Answering that contention the court said: "We are not of that view." No reasons were stated. We regard the case as distinguishable, but to the extent it is not it is out of accord with the cases previously cited herein, and in any event is not controlling as an interpretation of our statute.

Appellee argues that his rights are not affected even if Dillon were guilty under the penal provisions of the statute. (Laws 1931, ch. 194, § 9.) Perhaps if Dillon were guilty plaintiff also was guilty as an aider or abettor. (*State v. Johnson,* 116 Kan. 390, 226 Pac. 758.) But we are not here dealing with the criminal features of the statute; we are examining the right, power, or authority of Dillon to act as a local public warehouseman in the receiving of grain for storage, and our conclusion on that point is that he had no such power or authority. A purported contract made with one who has no legal power to make it is void. (Restatement, Contracts, § 18.) Had Dillon issued warehouse receipts to plaintiff for the grain alleged to have been stored with him, such receipts would have been void. His writing the word "storage," or some abbreviation thereof, on scale tickets, or on his ledger accounts, did not convert such scale tickets into valid warehouse receipts.

In construing the evidence in this case another general rule of law must be taken into account. Persons are presumed to conduct their business in harmony with law, and not in such a way as to be in violation of law, subjecting themselves to severe penalties. One is

not presumed to commit crime. In *Bank of Commerce v. Flanagan Mills & Elevator Co.,* 268 Mo. 547, 188 S. W. 117, the court stated this rule as follows:

". . . if a contract is fairly susceptible of two constructions, one making it legal and the other illegal, we should give it the construction which would make it effective and legal, rather than the other." (p. 575.)

In that case the court also held that receipts not issued by warehouses are not warehouse receipts, although in the form of warehouse receipts. In this case the evidence is open to the construction that plaintiff took his wheat to the elevator without any intention of having it returned to him, or exercising any control over it, but with the intention of taking his scale tickets to the elevator when the price .suited him and receiving pay for it. He could do that lawfully, if he were selling his wheat. Even if he had the option to receive grain of like kind and quality, or the cash, it would constitute a sale under *Bonnett v. Shipping Association,* 105 Kan. 121, 181 Pac. 634. The conduct of the parties should not be construed as indicating their intention to do an unlawful act, that is, to store grain in violation of law, with severe penalties imminent, if their conduct is reasonably open to the other view.

The evidence discloses Dillon knew he had never complied with the law, and that he was not doing business as a local public warehouseman. Plaintiff, dealing with Dillon, was bound also to know that fact, for the reason that he is bound generally to know the law of the state, and furthermore, had it been a public warehouse the license therefor would have been posted in a conspicuous place in the office room of the elevator. Hence, both of the parties knew that Dillon had no right, power, or authority as a public warehouseman to receive grain for storage or transfer for the public.

In *Clark v. Murphy,* 142 Kan. 426, 49 P. 2d 973, a great deal had been said in the evidence and the briefs about stored wheat. This was commented upon in the opinion and the view expressed that perhaps the relation between the parties under the evidence was that of debtor and creditor. However, none of the parties who claimed to have stored wheat were before the court, and no binding decision was made respecting their rights. A number of our cases have dealt with some phase of the contract, or what is claimed to be a contract, for the storing of grain. (*Jones v. Board of Trade,* 52 Kan. 95, 34 Pac. 453; *Bryan v. Congdon,* 54 Kan. 109, 37 Pac. 1009; *Moses v. Teetors,* 64 Kan. 149, 67 Pac. 526; *Elevator Co. v. Harris,*

6 Kan. App. 89; *Bank v. Elevator Co.*, 9 Kan. App. 144, 58 Pac. 483; *McSherry v. Blanchfield*, 68 Kan. 310, 75 Pac. 121; *State, ex rel., v. Railway Co.*, 87 Kan. 348, 125 Pac. 98; *Bank v. Elevator Co.*, 96 Kan. 461, 152 Pac. 647; *Farney v. Hauser*, 109 Kan. 75, 198 Pac. 178; *Morse v. Grain and Ice Co.*, 116 Kan. 697, 229 Pac. 366; *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.*, 120 Kan. 21, 245 Pac. 734; *Zuber v. Minshall*, 123 Kan. 595, 256 Pac. 806; *Kansas Flour Mills Co. v. Harper County Comm'rs*, 124 Kan. 312, 259 Pac. 795; *Hoop v. Kansas Flour Mills Co.*, 124 Kan. 769, 262 Pac. 544; *Kansas Wheat Growers Ass'n v. Farmers Elevator Co.*, 127 Kan. 27, 272 Pac. 181; *Penalosa State Bank v. Calista Grain and Mercantile Co.*, 128 Kan. 132, 276 Pac. 70.)

Most of these cases dealt with some phase of our statute then in force relating to the inspection or storing of grain, and warehouses therefor. In some of them the statute was not referred to. None of them had to deal with the statute here involved on the specific point here determined, namely, the power or authority of one operating an elevator on or adjacent to the property of a railroad who had not complied with the law entitling him to engage in the business of conducting a warehouse for the storage of grain for the public and issuing warehouse receipts therefor. We find nothing in any of the cases contrary to the views here expressed.

Appellant's contention that appellee is estopped to contend that he stored grain with Dillon is well taken. He knew when he took it there Dillon could not store grain, that he had no legal power or authority to do it; yet he left his grain there under such circumstances that Dillon might mingle it with other grain and handle it as an apparent owner and with the intention, when the price suited him, of going there, taking his tickets, and receiving from Dillon pay for his wheat. We need not quibble over the words whether he planned to "sell" his wheat at that time, or to "settle" for it. He did not expect Dillon to handle it in a way to identify it so he could get the same wheat back. In the years he had transacted business in a similar way with Dillon he had never asked for any wheat back. At the most he would be entitled only to pay in cash, or pay in wheat of such kind and quality as Dillon might then have on hand, and he was willing to take.

The statute (Laws 1931, ch. 194) is designed to be a beneficial one. Had Dillon complied with it he could have received plaintiff's grain for storage, and plaintiff would have been protected not alone

by Dillon's financial ability but by his bond. The benefits of the statute will result from complying with it; not by ignoring it and rendering it nugatory. Plaintiff could not so deal with Dillon as to aid and abet him in violating it and then reap all the benefits he could have obtained if the statute had been complied with. Dillon had a right to buy grain, and plaintiff to sell to him, on terms of immediate or delayed payment, and at the price the day it was delivered, or some future day. They had no right to make a storage contract. The result is, plaintiff sold his wheat to Dillon; Dillon owed him for it; the title to the wheat passed to Dillon; he could sell it as his own, as he did do to appellant, and when appellant paid Dillon in full for the wheat it owed nothing more either to Dillon or to plaintiff.

From what has been said it is not necessary to discuss other points argued. The judgment of the court below must be reversed with directions to render judgment for appellant.

It is so ordered.