#### No. 39,470

J. E. SHUGAR, *Appellee,* v. HOWARD C. ANTRIM (Defendant) and CONTINENTAL GRAIN COMPANY, a Corporation, *Appellant.*

ALFRED KAUFMAN, *Appellee,* v. HOWARD C. ANTRIM (Defendant) and CONTINENTAL GRAIN COMPANY, a Corporation, *Appellant.*

DELLA NELSON and EVERT JOHNSON, Guardians of AUGUSTA NELSON, An Incompetent, *Appellees,* v. HOWARD C. ANTRIM (Defendant) and CONTINENTAL GRAIN COMPANY, a Corporation, *Appellant.*

(276 P. 2d 372)

Opinion filed November 13, 1954.

*Philip W. Tone,* of Chicago, Illinois, argued the cause, and *J. R. Rhoades* and *George R. Lehmberg,* both of McPherson, were with him on the briefs for the appellant.

*Evart Mills,* of McPherson, argued the cause, and was on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: These were actions to recover the value of certain wheat delivered by plaintiff farmers to an unlicensed grain elevator in the city of Galva.

During the June and July, 1952 wheat harvest season, plaintiffs delivered wheat to the elevator of Howard C. Antrim doing business as the Antrim Grain Company at Galva. Antrim's warehouse license from the state of Kansas had expired on May 30 of that year and had not been renewed. Upon delivery of their wheat, plaintiffs received scale tickets showing the amount of wheat delivered and marked "storage" or "st," leaving their grain in what they apparently assumed was open storage, until April, 1953, when they heard that Antrim had closed his elevator. After a futile attempt to contact Antrim in Kansas City, plaintiffs filed these separate lawsuits against Antrim, alone, to recover the value of the wheat. Two days thereafter, attachment proceedings were commenced in the Shugar case against the property of Antrim. The sheriff attached 957 bushels of wheat in the elevator at Galva as the property of Antrim. The wheat was sold and the proceeds paid to the clerk of the court to abide final disposition of the cause. Subsequently, plaintiff Kaufman amended his petition to name Continental Grain Company as an additional defendant, alleging that Antrim was, or with Continental's approval held himself out to be, Continental's agent in purchasing or receiving grain for storage. Later plaintiffs Shugar and Nelson filed similar allegations. The defendants filed their answers to the respective petitions and, among other matters not pertinent hereto, denied under oath any existing agency. The cases were consolidated in the lower court for trial and will be so treated here. At the close of plaintiffs' case, Antrim demurred on

the ground that plaintiffs' evidence showed that a disclosed agency existed and, therefore, Antrim was not liable. The court without hearing further evidence with respect to the issue of agency, sustained Antrim's demurrer and dismissed him from the case. Continental Grain Company demurred to plaintiffs' evidence on the ground that it failed to sustain a cause of action against it. This demurrer was overruled. Continental then introduced its evidence after which the court entered judgment in favor of the plaintiffs and against Continental for the value of the wheat. Post-trial motions were filed and overruled by the court and, from the judgment entered against Continental, it appeals. The facts in these cases are substantially undisputed.

In May, 1947, Antrim purchased two elevators in Galva, a 10,000 bushel elevator on the right-of-way of the Atchison, Topeka & Santa Fe Railway Company, and a 55,000 bushel elevator on the right-of-way of the Chicago, Rock Island and Pacific Railroad Company. He operated these elevators as one, under the name of Antrim Grain Company, and they will be hereinafter referred to in the singular. The purchase price of the elevator was $24,000. Antrim paid $2,000 of this from his own funds, and borrowed $2,000 from a friend, and the remaining $20,000 he borrowed from the Continental Grain Company, which took a chattel mortgage on the elevator as security, since the railroads owned the underlying fee.

At the time Antrim purchased the elevator, he entered into a finance agreement with Continental Grain Company, the purpose of which was to provide for the purchase of grain by Antrim for resale to Continental. This agreement provided that Continental would submit daily, or at such frequency as the parties agreed upon, a bid price which it was willing to pay Antrim for grain. Antrim agreed forthwith upon the purchase of any grain to sell, and deliver the same to Continental. Antrim was authorized to draw drafts upon a designated local bank in favor of the grower for the net amount due the grower from Antrim for the grain sold by the grower to him. The local bank, in turn, was at the close of each business day to draw on Continental Grain Company for the full amount of all the drafts drawn on it by Antrim. Antrim would then ship the wheat to Continental. Continental agreed to honor all drafts so drawn, and immediately the title to the grain should pass and vest in Continental. Antrim agreed to accept only grain

purchased and paid for by draft, as above indicated, except he was permitted to accept grain for storage if the elevator was licensed and bonded as a warehouse. Antrim was to forward each day to Continental Grain Company a report showing all purchases of grain, and grain received for storage.

During the harvest season, wheat flowed into the elevator in large quantities. The growers as a rule wanted to get rid of their wheat, and after harvest they would come in and either sell their wheat or take a warehouse receipt, or dispose of it as they chose. When wheat was brought in under these circumstances, and the farmer did not sell it as he delivered it, the scale tickets would be marked "st" for the word "store." The elevator would ship the wheat as rapidly as possible in order to make way for additional wheat. Ordinarily, the disposition of the wheat thus shipped during the harvest season was not determined until after that season was over. If the wheat had been purchased by Antrim by draft, as above set forth, it was sold and became the property of Continental, as mentioned. If the wheat was not paid for by draft, and no warehouse receipt was requested, the wheat was delivered to Continental and held to the credit of Antrim. Such wheat was shown on Continental's books as an overshipment. Later, certain producers requested of Antrim warehouse receipts for wheat delivered. Upon receiving such requests from producers, Antrim made a written request to Continental for a warehouse receipt in the name of the grower, and Continental issued the receipt to the particular grower who had requested the same from Antrim, and charged the same against the overshipment to the credit of Antrim. No such requests for warehouse receipts were made by plaintiffs for the wheat in question herein.

The name of Continental Grain Company appeared nowhere on the elevator, it being operated by Antrim Grain Company. Antrim received the profits from the operation of his elevator, bore the expenses, employed the manager, paid the wages, made Federal withholding and social security tax reports, all in the name of Antrim Grain Company. Antrim also handled sidelines at the elevator such as feed, fertilizer and similar items, and when any purchases of these items were made, customers, including plaintiffs, issued checks to Antrim Grain Company. Continental had no control over wheat which was not paid for by draft drawn upon it. Antrim shipped some wheat to others besides Continental.

Plaintiffs contend the evidence, which has been summarized, discloses that Antrim was acting as the agent of Continental Grain Company. Defendant contends that the evidence fails to support such agency. All parties rely upon our somewhat recent case of *Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803.

Therefore, the sole question presented here is whether Antrim, under the evidence, was at the time he received plaintiffs' wheat acting as the agent of Continental Grain Company.

At the outset, it may be stated Antrim Grain Company was not bonded, and had not complied with the statute (G. S. 1949, ch. 34, art. 2) so as to be a public warehouseman at the time of the transactions involved herein, and as a matter of law plaintiffs' delivery of their wheat to Antrim constituted a sale of the grain. (*Kipp v. Goffe & Carkener,* 144 Kan. 95, 58 P. 2d 102, 108 A. L. R. 918; *Schmitz v. Stockman,* 151 Kan. 891, 101 P. 2d 962; *Greep v. Bruns,* supra.)

The determination of what constitutes agency and whether there is any competent evidence reasonably tending to prove its existence is a question of law to be determined by the court. (*Greep v. Bruns,* supra; 1 Mechem on Agency, 2d Ed., 213, § 293.) The burden of proof to establish relationship of principal and agent is on the party relying thereon. The law itself raises no presumption of agency, except in a few cases where the law confers authority. (*Greep v. Bruns,* supra; 1 Mechem on Agency, 2d Ed., 183, § 255; 2 Am. Jur. 349, § 442; 3 C. J. S. 252, 253, § 315.)

The authority of an agent may be either express or implied. It is express if the one sought to be charged has delegated authority to the agent by words which expressly and directly authorize him to do a delegable act. It is implied if, from statements of the parties, their conduct and other relevant circumstances, it appears the intent of the parties was to create a relationship permitting the assumption of authority by an agent which, when exercised by him, would normally and naturally lead others to believe in and rely on his acts as those of the principal. While the relation may be implied from a single transaction, it is more readily inferrable from a series of transactions. An agency will not be inferred because a third person assumed that it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem natural and probable, and to the advantage of the supposed principal, nor

from facts which show that the alleged agent was a mere instrumentality. (*Greep v. Bruns,* supra.)

The facts in the instant case are well in accord with *Greep v. Bruns.* In our examination of the record, we fail to find any tangible evidence that, in the purchasing of grain and operating, the elevator, Antrim was the agent of Continental Grain Company. An analysis of the two cases demonstrates that they are alike in every material respect. Antrim operated under the name of "Antrim Grain Company" and used that name on checks and drafts, and in other transactions with his customers; he received the profits from the operation of his elevator, and bore the losses; he owned his elevator building and equipment; he originally invested $2,000 of his money; and he paid all the operating expenses of his elevator by check of the Antrim Grain Company drawn on his own account. Under the agreement between him and Continental, he paid for grain by drawing a draft on a local bank, which bank was authorized to draw on Continental, and the wheat immediately became the property of Continental. Under his agreement with Continental, he purchased wheat which he was required to immediately resell to Continental and, upon such resale, it became the property of Continental. It had no control over and could not require Antrim to ship wheat not paid for by draft, as heretofore related. The fact that Continental Grain Company held a mortgage on Antrim's elevator is no evidence of an agency relationship. Also the fact that Continental issued warehouse receipts in the names of producers was no evidence that an agency existed between it and Antrim. There was no reason that Continental could not lawfully have issued such warehouse receipts on Antrim's order to any person named by him, when he had the necessary amount of grain resulting from his overshipment to Continental. There was no evidence that plaintiffs relied on such fact as constituting such agency.

From the facts in the instant case, there was no indication that either Continental or Antrim intended an agency relationship, nor did either represent to the public or to the plaintiffs herein that any agency existed. There was no competent testimony by any of the plaintiffs that they relied on any agency prior to or at the time of the delivery of the wheat. On the contrary, after Antrim closed his elevator, plaintiffs brought their action against him, alone, and alleged that he was the owner of the wheat in the elevator, and

caused the same to be attached and sold as Antrim's wheat, and it was only subsequent to these proceedings, and after Continental had reopened the elevator which it had taken under its mortgage, that plaintiffs demanded an inspection of Continental's books. Subsequent thereto, they secured an order from the trial court to make Continental a party defendant, and filed their amended petition asserting agency.

Under the facts in the instant case, the rules of law raised by the plaintiffs are controlled by the decision in *Greep v. Bruns,* supra, and are adhered to herein.

It follows that the judgment of the lower court must be reversed, and the case remanded to the trial court with instructions to set aside its judgment and enter judgment for the defendant for costs.

It *is so ordered.*