TRAVELERS INDEMNITY COMPANY
and C. W. Shaffer, Appellants,

v.

UNITED STATES of America, Kenneth
Day et al., Appellees.

No. 6161.

United States Court of Appeals
Tenth Circuit.

Oct. 28, 1959.

Tudor W. Hampton and Jerry M. Ward, Great Bend, Kan. (Herbert Rohleder, Great Bend, Kan., and Jerry E. Driscoll, Russell, Kan., on the brief), for appellants.

Wilbur G. Leonard, U. S. Atty., Topeka, Kan. (G. H. Penstone, Atty. in Charge, U. S. Dept. of Agriculture, Kansas City, Mo., on the brief), for appellee United States of America.

Robert J. Dole, Russell, Kan., for appellees Kenneth Day et al.

Before MURRAH, Chief Judge, and PHILLIPS and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

This litigation arose in Kansas when James K. Luder, a grain dealer, ended

the 1957 season with insufficient grain to satisfy his outstanding storage obligations. The United States was the owner of warehouse receipts which were issued by Luder and then assigned to the Commodity Credit Corporation by farmers as collateral security for price support loans. This action was brought against Luder's bondsman and all known creditors and holders of grain storage obligations. The complaint sought the appointment of a receiver to preserve Luder's assets, the liquidation of his property, and a determination of the rights of the plaintiff and other creditors.

Luder was the owner and operator of a grain elevator at Dorrance, Kansas, as well as one at Waldo, 25 miles away. The elevator at Dorrance was duly licensed under Kansas law and authorized to accept grain for storage and to issue valid warehouse receipts. The elevator at Waldo was unlicensed and was not used for storage. Luder accepted the delivery of grain from farmers at Waldo, either for purchase or for storage at Dorrance. That which was purchased was disposed of by rail shipment, while the storage grain was transported by truck to the licensed elevator at Dorrance where it was stored.[1] Thereafter, warehouse receipts were issued to the producers who requested them. The District Court was of the opinion that it was essential, in order to pass on other issues in the case, to first determine the ownership of the grain which came into the

hands of the receiver. By agreement of the interested parties, the testimony of a number of wheat growers who had delivered wheat at Waldo was taken to determine this issue. The trial court found that acceptance of delivery of the grain at Waldo was not a sale and that warehouse receipts issued after the grain was transferred to Dorrance were valid and binding obligations of Luder. We allowed an appeal on this phase of the case as an appeal from an interlocutory order pursuant to Title 28 U.S.C.A. § 1292.

As to the material facts, there is no dispute. The elevator at Waldo was known as "Luder Grain Company"; the elevator at Dorrance was called "Dorrance Grain Company". They were both owned by Luder and were operated as a single business. There was but one bank account and one set of books; and all obligations were paid by the Dorrance Grain Company. The grain in question here was produced by sixteen different farmers and deposited with Luder at Waldo, where it was placed in bins used only for wheat accepted for storage, and was then loaded into trucks and transported to Dorrance. The sixteen farmers had no intention of selling the grain to Luder, but understood that he was to transfer the same to his licensed elevator at Dorrance for storage. After the transfer, and while the wheat was in storage, warehouse receipts were issued from the Dorrance elevator when the farmers so requested.[2] At the time the

1. As to this transfer, Mr. Luder testified:

"Q. Then it was your understanding, and the farmer's understanding—I want to make the record complete—that at no time was any of this wheat of the farmers listed by Mr. Hampton, sold? A. No time was it sold.

"Q. Then you didn't buy any of it? A. I didn't buy any of it.

"Q. Didn't pay for any of it? A. I didn't pay for any of it.

"Q. You didn't agree on the price of it? A. No.

"Q. And there was enough wheat transferred from the Waldo facility to Dorrance to cover all of the scale tickets

that you issued on these particular individuals? A. That's correct.

"Q. The effect of the transaction was actually no different than if they would have taken wheat directly to Dorrance and you would have issued a warehouse receipt on it, except that you transferred the wheat there yourself? A. I transferred the wheat.

"Q. But your relations with them would have been the same? A. The same.

"Q. That applies to at least the 6,600 bushels which was produced by these people listed? A. Yes."

2. As to this delivery, the court found:

"3. Prior to November 7, 1957, certain wheat producers delivered 1957 crop

grain was received at Dorrance, and when the receipts were issued, the record does not disclose that there was a shortage of wheat there.

The question presented here is whether under Kansas law a grain producer who delivers grain to an unlicensed warehouse as a step in securing its ultimate transfer to a licensed warehouse, thereby makes a sale of the grain, irrespective of his intent or the intent of the warehouseman, and so loses his title by operation of law, even though the grain is transferred as intended. We agree with the trial court that the transaction resulted in a bailment and title remained with the grower.

Relying on Kipp v. Goffe & Carkener, 144 Kan. 95, 58 P.2d 102, 108 A.L.R. 918, and the Kansas cases which follow,[3] the appellants contend that the trial court's findings and conclusions are erroneous. The Kipp case is distinguishable on the facts, and not applicable. There the elevator operator had not attempted to comply with the Act so as to bring himself within its provisions, and no license was issued to him. See Hartford Accident and Indem. Co. v. State of Kansas, 10 Cir., 247 F.2d 315. In addition, there was absent the fact of warehouse receipts being issued for the grain after its arrival in a licensed warehouse. Here the evidence is without conflict that the grain of these sixteen farmers, although deposited at Waldo at an unlicensed elevator, was received only as a part of a transaction which the parties contemplated would include the transfer of the grain to the licensed elevator at Dorrance where warehouse receipts then would be issued. As stated in the Kipp case, the handling and storage of grain for the public in warehouses is "recognized to be of such importance as to be affected with the public interest, and subject to reasonable statutory regulations * * *." [144 Kan. 95, 58 P.2d 106.] The statutory regulations of Kansas place strict requirements on those engaged in such business, including the furnishing of bonds conditioned upon compliance with those requirements. Clearly the purpose of the statute is to protect the public, including farmers who store their grain in warehouse facilities. To hold as contended for by the appellants would be directly contrary to this purpose. It would provide a method whereby an innocent grain owner would lose title to his product even though it was stored in a licensed warehouse as the parties intended it ultimately should be. We are of the opinion that a reasonable interpretation of the Kansas statute is that if a licensed warehouseman takes possession of an owner's grain at a place other than a licensed warehouse and, in compliance with an

---

wheat to the defendant James K. Luder at Waldo, Kansas. Part of this wheat was purchased immediately by the defendant James K. Luder and deposited in certain bins from which it was resold by the defendant Luder, loaded into rail cars and shipped to terminal elevators. The producers of the balance of such wheat indicated they might want to obtain warehouse receipts so they could get Government price support loans. None of such producers sold or intended to sell their wheat and Luder did not buy or intend to buy their wheat. The elevator at Waldo was used solely as a dumping place for such wheat. Such producers entered into oral contracts with Luder pursuant to which Luder as the agent and employee of each of such producers temporarily placed such wheat in other bins adaptable to the loading of trucks and trucked the wheat to Luder's licensed warehouse at Dorrance, Kansas. The wheat to be trucked to Dorrance was kept separate from the wheat which was purchased. After such wheat was trucked by Luder at his expense to Dorrance from Waldo, part of said wheat was sold to James K. Luder. James K. Luder then issued warehouse receipts on his Dorrance warehouse to the producers of most of the remainder of such wheat. Warehouse receipts representing 6,612.95 bushels of such wheat were thereafter negotiated to Commodity Credit Corporation, a wholly owned agency of the United States, as collateral security for price support loans. * * *"

3. These cases are: Shugar v. Antrim, 177 Kan. 70, 276 P.2d 372; Schmitz v. Stockman, 151 Kan. 891, 101 P.2d 962; and Green v. Fortune, 151 Kan. 598, 100 P. 2d 631.

agreement of the parties that grain later is actually transferred to and stored in his licensed warehouse, the owner does not lose title and valid warehouse receipts or other evidence of ownership may be issued.[4]

Affirmed.

4. In Hartford Accident and Indemnity Co. v. State of Kansas, 10 Cir., 247 F.2d 315, 319, we said that the Kansas Warehouse Act "contemplates that the relationship of a warehouseman and depositors of grain may exist even though no statutory warehouse receipt was issued * * *."