No. 40,931

S. Dean Evans, Sr., Arnold L. Romeiser, Merle Ritterhouse, Frank J. McBride, A. Leroy Magnuson, Partners Doing Business as Evans Grain Company, *Appellants*, v. V. R. Duttlinger, C. L. Duttlinger and J. S. Duttlinger, *Appellees*.

(327 P. 2d 891)

Opinion filed July 7, 1958.

*John Q. Royce*, of Salina, argued the cause, and *E. S. Hampton, H. H. Dunham, Jr., H. G. Engleman, C. Stanley Nelson, Jack N. Stewart*, all of Salina, and *J. H. Jenson*, of Oakley, were with him on the briefs for the appellants.

*Corwin C. Spencer*, of Oakley, argued the cause, and *C. A. Spencer*, of Oakley, was with him on the brief for the appellees.

The opinion of the court was delivered by

JACKSON, J.: This is an action by the holder of a check against the payee on his endorsement and also against drawers of the check.

The defendants pleaded failure of consideration and that plaintiffs were the principals of L. E. Gridley to whom the defendant, J. S. Duttlinger, had negotiated the check for $4,200 to pay for 1400 bushels of wheat and 1450 bushels of milo; that within a day or so, Gridley died and there was no grain in the elevator, managed by Gridley and controlled by plaintiffs, to cover Duttlinger's purchase; that payment of the check had been stopped. Plaintiffs' reply joined issue on the answer. The case was tried to a jury, and the court instructed that the following facts were established:

"On February 25, 1956, defendants V. R. Duttlinger and C. L. Duttlinger, under the business name of Duttlinger Bros., executed their check in the amount of $4,200.00 (Plaintiffs' Exhibit 1 herein) payable to the defendant J. S. Duttlinger, and delivered the same to J. S. Duttlinger. Thereafter, J. S. Duttlinger endorsed said check and delivered same to L. E. Gridley. Thereafter, L. E. Gridley endorsed said check and delivered same to the plaintiffs herein. Thereafter L. E. Gridley died on February 29, 1956. Thereafter said check was presented for payment by plaintiffs to the Farmers State Bank, Oakley, Kansas, on which it was drawn, and was not accepted by said bank because payment thereof had previously been stopped by the defendants. Said check has not since been paid.

"These are the undisputed facts which need not be further proven by either party."

The defendants assumed the burden of proof and after the close of all of the evidence, the jury found in defendants' favor, answering special questions as follows:

"(1) Was the contract between L. E. Gridley and Evans Grain Company cancelled and terminated on or before January 31, 1956? Answer: No.

"(2) Was the $4,200 check given by J. S. Duttlinger to L. E. Gridley a loan to L. E. Gridley? Answer: No.

"(3) If your answer to Question No. 2 is 'No', then state:

"(a) Was L. E. Gridley acting contrary to instructions in offering this grain to J. S. Duttlinger? Answer: No.

"(b) Had L. E. Gridley told defendants what these instructions were? Answer: Yes."

After post-trial motions were overruled, plaintiffs appeal from the judgment and orders overruling their various motions. The main question is whether there is sufficient evidence to uphold the finding of the jury that Gridley was the agent of plaintiffs in making the sale of the grain to Duttlinger and therefore plaintiffs are unable

to claim to be holders of the check in due course. This would seem to turn upon the effect of the contract between Gridley and the plaintiffs which was introduced in evidence by the defendants:

"Salina, Kansas
June 28, 1955

"L. E. Gridley
"Gridley Grain Co. ·
"Monument, Kansas

"This letter will serve as an agreement and contract between you and ourselves relative to our advancing funds for the purpose of buying grain at your elevator. We are to advance these funds under the following terms and conditions:

"(1) We will furnish the money solely for the purposes hereinbefore set forth and for no other purpose whatsoever, and none of said sums so advanced shall be used for the purchase of feeds, seeds, coal, lumber, hardware or any other merchandise of any kind or character whatsoever except grain. Said sums being advanced for the purpose of buying grain at Monument, Kansas for the period beginning June 28, 1955 and ending as per paragraph 11 of this contract.

"(2) You are to have your elevator in shape for the handling of grain efficiently and maintain the same in that condition at all times during the life of this agreement.

"(3) We will cooperate with you in the hiring of a manager and any manager hired by you must be satisfactory to us and must furnish bond approved by us. You agree to be responsible for any dishonest or fraudulent acts committed by any person employed in your business.

"(4) Your manager is to mail us a daily report of all grain bought, sold and shipped. From these reports we will keep a complete record of all grain bought, sold and handled at your elevator.

"(5) We shall have the right to dictate the policy of buying, hedging and selling all grains purchased or handled by you, and shall dictate the manner of shipping and handling said grains; and we shall have the right to buy from you all grain so purchased.

"(6) Our charge on all grain purchased or handled shall be 1-½¢ per bushel except that when the charge of the Kansas City or Salina Boards of Trade is over 1-½¢ per bushel then our charge shall be the same as that charged by the Kansas City or Salina Boards of Trade and the price to be paid for all grain purchased by us from you shall be equal to the average of the prevailing values at the time of purchase for grain of like grade, taking all factors of value into consideration, including such factors as location of grain and time of shipment. Our charge on local Warehouse Receipt grain shall be 1-½¢ per bushel per storage year or portion thereof.

"(7) You shall carry Public Liability and Workmen's Compensation Insurance, also fire insurance on both the elevator and the grain contained therein and any other type of insurance which we see fit for the benefit of your business. This insurance shall be a part of the operating expenses.

"(8) In order to arrive at the grain profits of the elevator, we will deduct

from your selling price of the grain to us the cost of the grain, all expenses charged out of this office such as telephone and supplies will be deducted from your profit & loss statement. The difference shall constitute the profit or loss and shall be yours and in no way shall we be considered a partner in your business.

"(9) We shall send statements to you at intervals to be agreed upon, showing the condition of the business. We will keep in reserve for your account the value of 1% of the total bushels handled to cover possible shrinkage and a sum equal to 25% of the net profits. Accompanying each statement we will send you a check for the balance of any profits due you and on October 31st, providing we have had an opportunity to have a weigh-up or clean-out of all grain on hand, we will mail you all money due you at that time. However, if a weigh-up or clean-out is conducted prior to October 31 or any date thereafter all money will be sent you basis such weigh-up or clean-out.

"(10) If any statement figured as provided in the two preceding paragraphs shows a balance due us, you shall pay us such balance within 10 days from the date you received the statement. Upon your failure to make payment we have the option to cancel this agreement.

"(11) This contract shall remain in force for one year and from year to year from its date without further action on the part of either party unless notice in writing of cancellation is given to the other party by the party desiring to cancel at least 3̶0̶ days prior to desired expiration date.

10

L. E. G.

"Evans Grain Company,
By S. Dean Evans, Sr.,
Partner.

Accepted:
L. E. Gridley."

The plaintiffs wrote a letter to Gridley on January 13, 1956, which also was introduced into evidence by the defendants. It read as follows:

"January 13, 1956

"Mr. Lawrence Gridley
Monument, Kansas
Dear Lawrence:

"Please refer to our contract with you dated June 28, 1955. We have given your matter considerable thought there at Monument and we will have a January 31, 1956 statement ready for you in the next few days at which time we would like to cancel our working agreement with you.

"According to our figures you have some cash wheat at both Grinnell and Monument and you should order clean up cars so that the records will show no cash wheat on hand. Also the records show you have milo at both places and in talking with John Norlin we feel that if we can move it out of Monument at a break even basis we should do so immediately for you to get the money out of the milo to pay us the amount due.

"As soon as you can dispose of these stocks, which should be within the next few days, we will take off an accounting for you.

"Very truly yours,
EVANS GRAIN COMPANY
By S. Dean Evans, Sr.

SDE:eg"

As shown by the last letter, plaintiffs were in the progress of closing out their arrangement with Gridley. They contend that he was not authorized to sell wheat at Monument. The letter does not deny him that right which was clearly provided for in the original contract set out above. In fact, Gridley was expressly advised to sell the milo locally at Monument.

Plaintiffs rely on the cases of *Shugar v. Antrim,* 177 Kan. 70, 276 P. 2d 372; and *Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803, to show that no agency existed between themselves and Gridley. Those cases would seem not to sustain plaintiffs' position. Actually, certain language in both opinions would indicate that an agency might be thought to exist in the case at bar. In the Antrim case, *supra,* at page 73, it is said:

"Continental had no control over wheat which was not paid for by draft drawn upon it. Antrim shipped some wheat to others besides Continental."

In the Bruns case, *supra,* at page 57, it is said:

"With respect to the Kansas Elevator Company what the evidence does disclose is that it had entered into an arrangement with Jesse Bruns to stake him in the buying of grain—a not uncommon occurrence in Kansas—with no right to direct his operations except as to the shipping of grain for which it had advanced the money, or to share in the profits, and no thought or intention of assuming liability for his debts."

Attention is directed to paragraph numbered (5) in the above contract between plaintiffs and Gridley as well as to other provisions of that contract.

The above evidence fully warranted the trial court's submission of the question of agency to the jury, and the court's approval of the jury's verdict and the placing of the plaintiffs as holder of the check in the shoes of Gridley, their immediate endorser and business associate.

Certain other matters urged by plaintiffs as appellants herein have been fully considered, but require no comment in this opinion.

The judgment of the district court is hereby affirmed.